REVISED - March 5, 2001

**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 97-10907

**CHARLES FREEMAN and ROSALYN BROWN,**

**Plaintiffs-Appellees-Cross-Appellants,**

**v.**

**CITY OF DALLAS,**

**Defendant-Appellant-Cross-Appellee.**

**Appeal from the United States District Court for the
Northern District of Texas**

February 22, 2001

Before JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, WIENER, BARKSDALE, EMILIO M. GARZA, DeMOSS, BENAVIDES, STEWART, PARKER and DENNIS, Circuit Judges.[*]

EDITH H. JONES, Circuit Judge:

The City of Dallas served notices on the owners of two vacant, deteriorated apartment houses, warning them to repair or demolish the structures. The owners fought the order according to City procedures but lost. After the City tore down the condemned buildings, the owners filed suit in federal court alleging violations of the Fourth Amendment and the Due Process Clause. A divided panel of this court held that although the City procedures complied with due process, the City must also obtain a pre-

---

[*] Chief Judge King did not participate in this decision.

demolition warrant of some sort in order to satisfy the Fourth Amendment. This court, sitting en banc, disagrees with the panel majority's interpretation of the Fourth Amendment and denies relief to the property owners. A warrant is unnecessary when a municipality seizes property that has been declared a nuisance by means of established police power procedures.

## I.

Between December 1992 and April 1993, Rosalyn Brown acquired two vacant, eight-unit apartment buildings in Dallas, Texas located at 2621 and 2611 Meyers Street. Brown paid $10.00 for the first building and $1.00 for the second, which had suffered fire damage prior to purchase. On August 11, 1994, Brown transferred a one percent undivided interest in both buildings to her brother, Charles Freeman. The buildings remained vacant during the entire period of plaintiffs' ownership.

Brown intended to rent the apartment units after making repairs. To this end, she asked Freeman to be the general contractor in charge of renovating the apartments. Freeman was neither a registered engineer or architect, nor did he possess a general contractor's license or trade license from the State of Texas. No construction company or crew worked for him.

In April and July of 1993, inspectors from the Dallas Department of Housing and Neighborhood Services (the "Department") cited the plaintiffs' two apartment buildings for non-compliance

2

with the City's Minimum Urban Rehabilitation Standards Code (the "Code"). According to the Department's inspectors, the buildings together needed nearly $200,000 in repairs to comply with the Code. When the Code violations were not corrected, the Department referred the matter to the Urban Rehabilitation Standards Board ("URSB") and recommended demolition.

The URSB was established by the City of Dallas to determine whether property condition reports filed by city inspectors identify violations of the City's building codes. The URSB comprises thirty private citizen members (and eight alternates) who are appointed by the Dallas City Council. The URSB may determine, after a hearing, whether a given structure is an "urban nuisance" and take various remedial measures. The URSB is authorized by city ordinance to order repairs, receivership, the closing and vacating of buildings, demolition, and civil penalties of up to two thousand dollars a day against property owners who fail to repair or demolish a structure after the board has issued a valid determination and remedial order. DALLAS, TEX., CODE ch. 27, art. II, § 27-8.

The URSB functions through hearing panels composed of members of the URSB. The Dallas City Code establishes the procedure to be used by the panels. At a hearing, "an owner, lessor, occupant, or lienholder may present witnesses in his own behalf and is entitled to cross-examine any witnesses appearing

3

against him." DALLAS, TEX., CODE ch. 27, art. II, § 27-9(c). The decision of the hearing panel is final except that rehearings may be granted in certain instances. The code also gives an affected property owner an absolute right to appeal the panel decision to state district court. DALLAS, TEX., CODE ch. 27, art. II,§ 27-9(e). Under state law, the court considers whether the landowner's substantial rights have been prejudiced because the URSB decision violates constitutional or statutory law; exceeds URSB's authority; is based on unlawful procedure or any other error of law; is unsupported by substantial evidence; or is arbitrary or capricious or an abuse of discretion. TEXAS GOV'T CODE § 2001.174(2).

After receiving the Department's reports on plaintiffs' properties, the URSB conducted a title search and mailed a notice of hearing on each of the properties to the owner of record.[1] The notice announced that the URSB might order demolition to remedy the Code offenses. It further stated that the property owner would "be given an opportunity to present evidence and witnesses if so desired."

In preparation for the hearings, Department staffers briefed the panel of URSB members assigned to decide the fate of

---

[1] Freeman did not get notice because he had no interest in either property at this time. Brown received a notice on 2621 Meyers Street, the property of which she was the owner of record. Brown did not receive notice on the 2611 Meyers Street property because, although she had purchased the property by this date, she had not yet filed a warranty deed. Instead, the notice on 2611 Meyers Street was sent to the owner of record, Robert Burkhead.

4

the Meyers Street properties.  They provided the panel members with information on the properties, including repair cost estimates, and accompanied some of them on a tour of the premises.

Freeman appeared at the hearings, identifying himself as the "attorney-in-fact for Brown" and as an owner of 2611 and 2621 Meyers Street.  The panel looked at pictures of the structures, questioned Freeman about his plans for repair, and asked whether he had the funds for repair.  Freeman testified that he lacked funds at present and asked for more time to make repairs.  Expressing doubt about Freeman's ownership and his ability to finance repairs, the panel unanimously voted to demolish each apartment building as an urban nuisance.[2]

---

[2] The Code defines an "urban nuisance" as the following:
> [A] premises or structure that:
> (A) is reasonably dangerous to the physical health or safety of an occupant or other person; or
> (B) because of violations of [the Code] . . ., its state of disrepair is such that it could reasonably cause injury, damage, harm, or inconvenience to a considerable portion of the community in the use and enjoyment of property, materially interfering with the proper use or comfort and enjoyment of surrounding property, taking into consideration the nature and use of the properties in the area and the character of the community in which they are situated, which condition would be substantially offensive and annoying to persons of ordinary sensibilities, tastes, and habits living in the community.

DALLAS, TEX., CODE ch. 27, art. I, § 27-3(23).
The Code goes on to prescribe with specificity the minimum structural, health and utility standards whose breach may result in the declaration of an urban nuisance.  Dallas, Tex., Code ch. 27, Art. III, § 27-11.

Following the hearing, Freeman signed notices of demolition for both apartment buildings. He then asked for and received a rehearing from the URSB. Two panel members visited the properties before the rehearings. They examined the exterior of the apartment building at 2611 Meyers Street. At 2621 Meyers Street, they ran into Freeman. He showed them repairs he had made inside that property, and they told him to bring pictures of these repairs to the rehearings.

At the rehearing, the Department showed pictures of the apartment buildings' exteriors. In response, Freeman testified that he thought he could acquire most of the repair materials at little or no cost. He further stated that he hoped to finance repairs through a loan from the City; he had received a commitment from relatives in the construction business to help him make repairs if he received a City loan.

Freeman also submitted pictures of one unit in the 2621 Meyers Street building that he had repaired, and he presented a list of repair materials that he had already collected. He further testified that he could renovate each unit at 2621 Meyers Street for $2000. Though panel members reacted skeptically and reminded him of the Department's repair cost estimates, Freeman did not inquire about the basis for these estimates nor did he ask to question the Department officials responsible for them.

6

The panel again voted to demolish plaintiffs' buildings. The vote was unanimous on the 2611 Meyers Street property and was split five to two on the 2621 Meyers Street property. Freeman received a notice of demolition for each property at the end of the rehearing, and he signed them. The notice advised that the panel's decision could be appealed within twenty days to state district court for review. Freeman and Brown did not appeal the URSB decision to state district court.[3]

When Brown and Freeman failed to demolish the buildings within thirty days, the City hired a contractor to do the work. The two vacant structures were demolished in late December 1994, and the costs of the demolition were assessed against Freeman and Brown in the total amount of about $16,000.

A year and a half later, Freeman and Brown filed suit against the City of Dallas under 42 U.S.C. § 1983. They alleged that the demolition of their apartment buildings without first

_____

[3] The URSB also sent notice of the order to demolish the building at 2611 Meyers Street to Freeman and notice of the order to demolish the building at 2621 Meyers Street to Freeman and Brown. The notices stated, in part:

> If you do not demolish the structure(s) within the time above indicated [30 days], the city will arrange to have this work done and the expense of that demolition performed under contract with the city will constitute a lien on the real property on which the structure(s) were located, and that lien will run with the land.

These notices were sent to the same addresses at which Brown and Freeman had received mail about earlier hearings, but they were returned as "Unclaimed."

7

obtaining a judicial warrant constituted an unreasonable seizure in violation of the Fourth Amendment. They also alleged that the URSB's procedure for condemning and demolishing their apartment buildings and for imposing liens on the remaining realty denied them procedural due process in violation of the Fifth and Fourteenth Amendments.

Freeman and Brown moved for summary judgment on the Fourth Amendment claim while the City moved for summary judgment on all claims. The district court granted the plaintiffs' motion on the Fourth Amendment claim and granted the City's motion on the Due Process claims. Following a one-day trial on damages for the Fourth Amendment violation, the district court accepted the jury's verdict and entered final judgment against the City of Dallas in the amount of $20,000 plus interest.

A divided panel of this Court affirmed the district court's summary judgment for the property owners with respect to the Fourth Amendment claim, while also affirming the rejection of the plaintiffs' Due Process claims.[4] *See* Freeman v. City of Dallas, 186 F.3d 601 (5th Cir. 1999), reh'g en banc granted, 200 F.3d 884 (5th Cir. 1999). We granted rehearing en banc to reconsider the Fourth Amendment ruling.

---

[4] This court reinstates the panel opinion concerning the Due Process claims.

8

## II.  DISCUSSION

The panel majority reasoned toward a violation of the Fourth Amendment in three steps.  First, the demolition of the Freemans' apartment houses was a "seizure" for Fourth Amendment purposes.  Second, the seizure had to be preceded by a warrant.  Third, a warrantless seizure, even if it occurred following constitutionally adequate local condemnation procedures, is unreasonable and therefore unconstitutional.  While we agree that the City seized the Freemans' real property for demolition,[5] we do not accede to the panel majority's inflexible warrant requirement in this context or its supplanting of the Fourth Amendment reasonableness inquiry with such a requirement.  The text of the Fourth Amendment conspicuously fails to require a warrant for every government search or seizure.  And the controlling caselaw emphasizes reasonableness, a balancing of governmental versus private interests, as the touchstone of the Fourth Amendment.

Since the relevant facts are undisputed, summary judgment was granted on the merits as a matter of law, *see* Fed. R. Civ. P.

---

[5]    "Seizure" of property occurs when there is some meaningful interference with an individual's possessory interests in that property, United States v. Jacobsen, 466 U.S. 109, 113, 104 S. Ct. 1652, 1656 (1984), and a "seizure" may occur in both civil and criminal contexts.  There can be no question that the city's actions against the Freeman's apartment buildings constituted a "seizure".  *See* Soldal v. Cook County, Ill., 506 U.S. 56, 62 & n.7, 113 S. Ct. 538, 544 & n.7 (1992), (holding that the forcible removal of a mobile home, leaving the owners dispossessed, constituted a "seizure" under the Fourth Amendment).

9

56(c).  We review the district court's decision *de novo*.  *See* United States v. Johnson, 160 F.3d 1061, 1063 (5th Cir. 1998).

The Fourth Amendment, made applicable to the States by the Fourteenth Amendment, Ker v. California, 374 U.S. 23, 30, 83 S. Ct. 1623, 1628 (1963), declares:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

This provision contains two separate and independent clauses.  The first proscribes "unreasonable searches and seizures," and the second prescribes the narrow conditions under which a warrant may issue.  Nothing in the text suggests that warrants are required for every search or seizure, nor is the existence of a warrant a *sine qua non* for a reasonable search or seizure.  While the text plainly mandates reasonableness in the seizure, it does not instruct whether a warrant is necessary to ensure the reasonableness of the City's demolition order.

To determine the necessity of a warrant here, we might consider common law at the time the Fourth Amendment was adopted, *see* Wyoming v. Houghton, 526 U.S. 295, 299, 119 S. Ct. 1297, 1300 (1999), but, contrary to plaintiffs' assertions, the quest would be fruitless.  Confusing the demands of due process with the warrant clause, plaintiffs' historical argument observes that, at common

10

law, apart from cases where a nuisance posing an imminent danger could be summarily abated by self-help, structures were ordinarily determined to be nuisances in criminal or civil abatement actions. Because the courts at the time of the framing of the Constitution oversaw nuisance law, plaintiffs assume that they must continue constitutionally to play a role under the aegis of the Warrant Clause. There are two serious flaws in this argument. First, none of the cases cited by the plaintiffs deals with warrants.[6] Instead, cases from the nineteenth century involved judicial review to determine whether structures or activities were in fact injurious under state and local police power.[7] Other cases evaluated nuisance determinations by the standards of procedural

---

[6] The federal government lacked authority over nuisances at and after the time of the framing, and the Fourth Amendment was not first applied to the states until 1961. Mapp v. Ohio, 367 U.S. 643, 646-47, 81 S. Ct. 1684, 1686-87 (1961).

[7] *See* Yates v. Milwaukee, 77 U.S. 497, 505, 19 L.Ed. 984 (1870)("It is a doctrine not to be tolerated in this country, that a municipal corporation, without any general laws either of the city or of the State, within which a given structure can be shown to be a nuisance, can, by its mere declaration that it is one, subject it to removal by any person supposed to be aggrieved, or even by the city itself."); Hennessy v. St. Paul, 37 F. 565, 566 (C.C. Minn. 1889)("[U]nless a nuisance, as defined by the common law or by statute, exists, the act of the common council cannot make it one by a mere resolution. Such a doctrine might place the property of the people, no matter what in fact might be its real condition and character, at the disposal of the common council, without compensation."); Underwood v. Green, 42 N.Y. 140 (N.Y. 1870); J.E. Macy, Annotation, *Constitutional Rights of Owner as Against Destruction of Building by Public Authorities*, 14 A.L.R.2d 73, *8 (1950) ("[N]either at common law nor under such express power can it, by its mere declaration that specified property is a nuisance, make it one when in fact it is not.").

11

and substantive due process.[8]  Whatever these cases may imply about

the historical view of the reasonableness of particular nuisance

decisions, they say nothing about employing the Warrant Clause to

review those decisions.

Second, the plaintiffs theorize that because nuisance

determinations historically involved judicial procedures, such

determinations can only be "reasonable" today if they are subject

to plenary court review.  This theory is fundamentally at odds with

the development of governmental administrative agencies.

Characteristically, agency decisions are deferred to by the courts.

Plaintiffs apparently seek, however, to broaden courts' involvement

in nuisance decision-making contrary both to the deferential

---

[8]    *See, e.g.,*  Lawton v. Steele,152 U.S. 133, 141,  14 S.
Ct. 499, 502 (1894) ("If the property were of great value . . . it
would be putting a dangerous power in the hands of a custom officer
to permit him to sell or destroy it as a public nuisance, and the
owner would have good reason to complain of such act as depriving
him of his property without due process of law."); Mugler v.
Kansas, 123 U.S. 623, 8 S. Ct. 273, 301 (1887)("The exercise of the
police power by the destruction of property which is itself a
public nuisance, or the prohibition of its use in a particular way,
whereby its value becomes depreciated, is very different from
taking property for public use, or from depriving a person of his
property without due process of law."); Our House v. The State, 4
Greene 172, 1853 WL 221, *2 (Iowa 1853)(holding that a law
declaring "dram shops" to be public nuisances, authorizing their
abatement, and establishing certain procedures for notice and a
hearing "does not deprive a person of his property without due
process of law").  The notion of substantive due process survives
in challenges to municipal zoning and nuisance decisions, as this
court has recently held.  John Corp. v. City of Houston, 214 F.3d
573, 581-86 (5th Cir. 2000) (allegation that city deprived
landowners of property by allowing demolition under
unconstitutionally vague ordinance states cognizable substantive
due process claim).

12

standard of judicial review of administrative decisions and to the broad standards for issuance of warrants. None of the decisions produced by plaintiffs justifies reverting to the 18th century judicial role in nuisance abatement. This court's comment in rejecting, over twenty-five years ago, a similar argument for reinstituting common law judicial review of nuisance determinations bears repeating:

> [F]or the purposes of marking the limits of federal constitutional due process the common law of nuisance must be considered a jurisprudential artifact, interesting but not controlling.

Traylor v. City of Amarillo, 492 F.2d 1156, 1159 (5th Cir. 1974) (Goldberg, J.). Even more emphatically, the common law of nuisance affords no basis for creating a per se judicial warrant requirement that is redundant of procedural and substantive safeguards inherent in modern administrative law and explicit municipal nuisance ordinances.

Where history yields no firm answer, a search or seizure must be evaluated under traditional standards of reasonableness. Wyoming, 526 U.S. at 300, 119 S. Ct. at 1300. There is no Supreme Court caselaw directly on point. Still, the Court has expressed an overarching test of reasonableness that is antagonistic to an inflexible warrant requirement. Thus, the reasonableness standard is one that reflects a "'careful balancing of governmental and private interests.'" Soldal, 506 U.S. at 71, 113 S. Ct. at 549, (quoting New Jersey v. T.L.O., 469 U.S. 325, 341, 105 S. Ct. 733,

13

742 (1985)). More recently, the Court reiterated, "as the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a government search is reasonableness." Vernonia School Dist. 47J v. Acton, 515 U.S. 646, 652, 115 S. Ct. 2386, 2390 (1995).[9] Vernonia also clearly distinguishes between the reasonableness of government searches and the warrant requirement:

> Where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, this Court has said that reasonableness generally requires the obtaining of a judicial warrant. Warrants cannot be issued, of course, without the showing of probable cause required by the Warrant Clause. But a warrant is not required to establish the reasonableness of all government searches; and when a warrant is not required (and the Warrant Clause therefore not applicable), probable cause is not invariably required either.[10]

---

[9] See also City of Indianapolis v. Edmond, 121 S. Ct. 447, 4451 (2000) ("The Fourth Amendment requires that searches and seizures be reasonable."); Ohio v. Robinette, 519 U.S. 33, 39, 117 S. Ct. 417, 421 (1996)("the touchstone of the Fourth Amendment is reasonableness") (internal quotations omitted); Whren v. United States, 517 U.S. 806, 817, 116 S. Ct. 1769, 1776 (1996)("It is of course true that in principle every Fourth Amendment case, since it turns upon a reasonableness determination, involves a balancing of all relevant factors.")(quotations omitted); Camara v. Municipal Court of San Francisco, 387 U.S. 523, 87 S. Ct. 1727, 18 L.Ed. 930 (1967)("[R]easonableness is still the ultimate standard [under the Fourth Amendment].") ; Carroll v. United States, 267 U.S. 132, 147, 45 S. Ct. 280, 283, 69 L.Ed. 543 (1925)("The Fourth Amendment does not denounce all searches and seizures, but only such as are unreasonable.").

[10] The Court goes on in the same paragraph of Vernonia to state that:

A search unsupported by probable cause can be

14

Vernonia, 515 U.S. at 653, 115 S. Ct. at 2390-91 (emphasis added) (citations omitted). Under these decisions, the fundamental inquiry, which we will address in detail later, is the reasonableness of the City's seizure.

The property owners contend, however, and this court's panel opinion held that, the seizure of their property was per se unreasonable unless the City obtained a warrant to enforce its demolition order. In support of this position, plaintiffs and the panel majority rely on a handful of cases. Their reliance is misplaced.

In companion cases, the Court did extend a warrant requirement of a sort to administrative inspections of private homes and business properties, the purpose of which was to verify compliance with municipal health and safety codes. Camara v. Municipal Court of San Francisco, 387 U.S. 523, 87 S. Ct. 1727 (1967); See v. City of Seattle, 387 U.S. 541, 87 S. Ct. 1737 (1967). Evidence of code violations uncovered by the warrantless searches might lead to fines or other penalties. Balancing the need for searches against the property owners' privacy, the Court

---

constitutional, we have said, 'when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable'.

515 U.S. at 653, 115 S. Ct. at 2391. By its terms, and by the Court's further explanation, the "special needs" caveat tends to expand rather than narrow exceptions to the warrant requirement. Further, "special needs" are relevant to relaxation of the probable-cause basis for a government search for evidence. Here, however, there is probable cause for the City's seizure.

15

concluded that warrants were necessary to check the unfettered discretion code enforcement officers had in the field.  A property owner had "no way of knowing whether enforcement of the municipal code involved requires inspection of his premises, no way of knowing the lawful limits of the inspector's power to search, and no way of knowing whether the inspector himself is acting under proper authorization."  Camara, 387 U.S. at 532.  Only with the protection of an administrative warrant would property owners avoid capricious or overbroad searches.

Camara and See are distinguishable from this case. First, since searches to gather evidence of regulatory noncompliance invade citizens' privacy "without particularized suspicion of misconduct,"[11] they need only satisfy standards of administrative reasonableness.  Marshall v. Barlow's, Inc., 436 U.S. 307, 320, 98 S. Ct. 1816, 1824 (1978) (requiring only administrative reasonableness for regulatory searches); Griffin v. Wisconsin, 483 U.S. 868, 877 n.4, 107 S. Ct. 3164, 3170 n.4 (1987) (requiring only administrative reasonableness for regulatory searches).  Here, the evidence of municipal  code violations had already been obtained by means unchallenged by the landowners, and the administrative adjudication of noncompliance has occurred.  The landowners availed themselves of two hearings resulting in a decision of the seven-member panel of the URSB, and after these

---

[11]     City of Indianapolis v. Edmond, ____ U.S. ____, 121 S. Ct. 447, 451 (2000).

16

proceedings, there remained a possibility of state court judicial review. What is sought by these plaintiffs is not protection against an unregulated search for evidence of wrongdoing, but additional protection to forestall the result of already-determined wrongdoing.

Second, the URSB, unlike the field code inspectors in Camara and See, could not operate with unbridled discretion. The municipal code specifies grounds on which a building may be determined to be a public nuisance.[12] The property owners' right to defend the case against their apartment buildings was procedurally secure. Only by impugning the institutional integrity of the URSB can one arrive at the conclusion, unsupported in this record, that it exercised standardless discretion and either arbitrarily enforced the municipal code or failed to consider the property owners' evidence. The nature of the URSB's adjudicative function[13] imposes more numerous and more transparent constraints on the URSB than did the evidence-gathering function performed by field officers randomly inspecting private buildings in Camara and See.

---

[12]    See *supra* note *2.*

[13]    The Texas Local Government Code describes the agencies like the URSB as exercising "Quasi Judicial Enforcement of Health and Safety ordinances."  Subchapter C, Texas Local Gov't. Code, Tit. 2, Subtitle D, Ch. 54 (§§ 54.032-54.042).

17

Third, it is hard to understand what protection the Camara-approved administrative warrant would provide for these plaintiffs. Camara relaxed the probable cause standard for issuance of such warrants, requiring only a more general determination that "legislative or administrative standards for conducting an area inspection" be reasonable. Camara, 387 U.S at 538, 87 S. Ct. at 1735-36. Camara-style administrative search warrants need not be issued by judicial officers. *See* Griffin v. Wisconsin, 483 U.S. 868, 877 and n.5, 107 S. Ct. 3164, 3170 and n.5 (1987). Plaintiffs also admit that administrative search warrants may be issued ex parte. While the Court's standards may meaningfully constrain officials who enter private property for inspection purposes, they are obviously ill-suited to regulate completed administrative condemnation proceedings. If a warrant of some type is to be imposed in lieu of state judicial review, it must be on terms different from the Camara warrants in order to assist these landowners. But if the terms are different, then a different justification is necessary.

Camara and See thus doubly fail to support the plaintiffs' argument. Those cases imply either that seizure of the apartment buildings was preceded by reasonable, rigorous procedures that protected the property owners' rights, or they mandate an ex parte, possibly nonjudicial administrative warrant shorn of probable cause, which does the property owners no good. While

18

useful in their sphere, these cases fail to support a warrant following a completed nuisance abatement procedure.

The landowners have also cited Soldal in support of their warrant argument, but Soldal is not even a warrant case. The only issue decided by Soldal was whether the nonjudicial eviction-by-relocation of the tenants' mobile home, with sheriffs' deputies assisting, constituted a seizure within the Fourth Amendment. The Court refused to consider whether the seizure was constitutionally reasonable, as it stated:

> Whether the [4th] Amendment was in fact violated is, of course, a different question that requires determining if the seizure was reasonable. That inquiry entails the weighing of various factors and is not before us.

Soldal, 506 U.S. at 62, 113 S. Ct. at 543.

In the final case offered by plaintiffs, the Supreme Court held that the IRS must obtain a warrant to search private premises to locate property that may be seized to enforce a valid federal tax lien. GM Leasing Corp. v. United States, 429 U.S. 338, 97 S. Ct. 619 (1977). More significantly for present purposes, the Court distinguished a search for unidentified nonexempt property from a seizure, and it rejected requiring a warrant for seizures of the taxpayer's vehicles from property where the seizures "did not involve any invasion of privacy." 429 U.S. at 351, 97 S. Ct. at 628. Similarly in this case, the plaintiffs retained little or no reasonable expectation of privacy in their dilapidated, uninhabited rental properties after the URSB had entered orders declaring them

19

an urban nuisance, and the owners had failed to abate the code violations.

GM Leasing also states that where seizures are sustainable under the Due Process Clause, constitutional analysis of the same acts under the Fourth Amendment "is similar and yields a like result." Id. at n.18. Texas's administrative condemnation procedures have withstood due process challenge. Traylor v. City of Amarillo, 492 F.2d 1156 (5th Cir. 1974). Far from supporting the plaintiffs, GM Leasing thus forecasts, even if it does not compel, that a balancing of the public and private interests at stake will favor the public interest in nuisance abatement after the conclusion of adequate administrative proceedings.

Not only does plaintiffs' theory lack support in Supreme Court caselaw, but it enjoys only minority support among the federal circuits. The Eighth and Sixth Circuits have found no Fourth Amendment bar to warrantless condemnation and eviction proceedings, where satisfactory administrative procedures preceded them. Samuels v. Meriwether, 94 F.3d 1163 (8th Cir. 1996); Hroch v. City of Omaha, 4 F.3d 693 (8th Cir. 1993); Flatford v. City of Monroe, 17 F.3d 162, 170 (6th Cir. 1994). On the other hand, a divided panel of the Ninth Circuit held that a warrant was necessary before city officials could enter private property to seize previously-condemned automobiles. Conner v. City of Santa Ana, 897 F.2d 1487, 1495 (9th Cir. 1990). We disagree with Conner

20

for reasons stated in Judge Trott's dissent, 897 F.2d at 1494-98, and based on our evaluation of Fourth Amendment reasonableness.

Although the City did not have to obtain a warrant to effectuate a valid seizure and demolition of the nuisance structures, the fundamental Fourth Amendment question of reasonableness remains, a question decided by balancing the public and private interests at stake.

As the Supreme Court has acknowledged, "the public interest demands that all dangerous conditions be prevented or abated." Camara, 387 U.S. at 537, 87 S. Ct. 1735. Regulation of nuisance properties is at the heart of the municipal police power.[14] It is eminently reasonable for a city to prescribe minimum property maintenance standards to protect the public and to maintain adjacent land values. Nevertheless, a city may not arbitrarily enter abatement orders or declare the existence of nuisances with

---

[14] While the Supreme Court has not specifically defined the scope of the police power, it has reaffirmed the "classic statement" of the rule:

'To justify the State in . . . interposing its authority in behalf of the public, it must appear, first, that the interests of the public . . . require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals.' Even this rule is not applied with strict precision, for this Court has often said that 'debatable questions as to reasonableness are not for the courts but for the legislature. . . .'

Goldblatt v. Town of Hempstead, 369 U.S. 590, 594-95, 82 S. Ct. 987, 990 (1962)(citations omitted).

21

no underlying standards. Texas law forbids such actions,[15] and the City's ordinance exemplifies the state statutes' criteria. Contrary to the landowners' argument, Dallas's minimum standards for property owners assure structural soundness, public health and safety and human habitability. The Dallas ordinance is not concerned with aesthetic or non-functional values. The ordinance falls well within the City's police power and thus within a sphere that courts have traditionally been reluctant to invade.

Prescription of standards necessitates their enforcement, and it is also reasonable that nuisance abatement be one of the enforcement mechanisms available to the City. While abatement is permissible, however, the City ordinance affords property owners the opportunity to contest the determination of non-compliance, to repair their property, or to seek other remedies. Dallas's procedures include reasonable notice to and time limits upon landowners' actions, multiple hearing possibilities, flexible remedies, and judicial review in state court under typical criteria for review of administrative actions.[16] That these standards comport with due process suggests the Fourth Amendment reasonableness of the URSB's final remedial orders.

---

[15] *See generally*, Tex. Loc. Govt. Code, Tit. 2, Subtitle D, ch. 54.

[16] Indeed, the grounds for state court judicial review are nearly identical to those standards employed historically by courts in reviewing nuisance decisions, *i.e.* the decisions on which plaintiffs seek to build the edifice of their warrant requirement.

22

With regard to the landowners' interests, the Fourth Amendment protects only those expectations of privacy that society recognizes as "legitimate". New Jersey v. T.L.O., 469 U.S. 325, 338, 105 S. Ct. 733, 741 (1984). "What expectations are legitimate varies, of course, with context . . . [and] . . . may depend upon the individual's legal relationship with the State". Vernonia, 515 U.S. at 654, 115 S. Ct. at 2391. Because the Dallas nuisance standards are straightforward and the administrative procedure is adequate, these property owners' expectation of privacy in the nuisance structures after the remedial orders became final was severely diminished. As vacant commercial properties, the structures were not subject to the same degree of privacy protection as non-business property. New York v. Burger, 482 U.S. 691, 700, 107 S. Ct. 2636, 2642 (1987); O'Connor v. Ortega, 480 U.S. 709, 725, 107 S. Ct. 1492, 1501 (1987). Further, nearly a year had passed since the plaintiffs were informed of their structures' non-compliance. While they did defend themselves before the URSB, they made no significant progress in remedying violations whose total repair cost was nearly $200,000. Whereas the landowners in Soldal were the victims of non-judicial eviction without prior notice, these plaintiffs had ample notice and a full panoply of administrative remedies. Finally, since the rent properties were uninhabited, the demolition, unlike the eviction carried out in Soldal, did not invade anyone's personal privacy.

23

Requiring an administrative warrant of some sort after the URSB proceedings would not have enhanced the landowners' security or privacy. A <u>Camara</u> warrant could be sought *ex parte;* it could be obtained solely on the basis of the completed administrative record; no requirements of pre- or post-warrant notification of the City's intended actions were necessary. If the purpose of a warrant is to obtain some neutral review of the URSB orders, this procedure is less protective of the landowners than existing judicial review in state court.

The ultimate test of reasonableness is fulfilled in this case by the City's adherence to its ordinances and procedures as a prelude to ordering the landowners to abate their nuisance structures.[17] The Supreme Court originally extended an administrative warrant requirement to civil investigations because "the basic purpose of [the Fourth] Amendment . . . is to safeguard the privacy and security of individuals against <u>arbitrary</u> invasions by governmental officials." <u>Camara</u>, 387 U.S. at 528, 87 S. Ct. at

---

[17] In reaching this conclusion, we do not ignore <u>Soldal</u>'s mandate that a particular government action may implicate more than one constitutional provision. <u>Soldal</u>, 506 U.S. at 70, 113 S. Ct. at 538. A particular nuisance determination might be reviewable under the Takings Clause or Substantive Due Process as well as the Fourth Amendment or Procedural Due Process standards. <u>John Corp. v. City of Houston</u>, 214 F.3d 573 (5th Cir. 2000). But the Fourth Amendment reasonableness of a seizure and demolition of nuisance property will ordinarily be established when the substantive and procedural safeguards inherent in state and municipal property standards ordinances have been fulfilled. *See* <u>Samuels</u>, 94 F.3d at 1168.

24

1730 (emphasis added); *see also* <u>Marshall</u>, 436 U.S. at 312, 98 S. Ct. at 1820. Whatever else the City's enforcement of its municipal habitation code might be, it is sufficiently hedged about by published standards, quasi-judicial administrative proceedings, and flexible remedies that it is not <u>arbitrary</u>. In the context of reviewing civil administrative and regulatory enforcement of laws enacted pursuant to the traditional police power, Fourth Amendment reasonableness means non-arbitrariness. The Fourth Amendment was not violated here.[18]

## CONCLUSION

For all these reasons, we conclude that the seizure and demolition of the plaintiffs' apartment buildings, after those structures were condemned according to City ordinance and state law, were reasonable under the Fourth Amendment. The judgment against the City is **REVERSED**.

---

[18] *Cf.* <u>Soldal</u>, 506 U.S. at 71, 113 S. Ct. at 549 ("Assuming . . . that the [evicting] officers were acting pursuant to a court order . . . a showing of unreasonableness would be a laborious task indeed."). Likewise, we believe a showing of unreasonableness in the face of the City's adherence to its ordinance is a "laborious task indeed."

DENNIS, Circuit Judge, with whom WIENER, BENAVIDES and STEWART, Circuit Judges, join in Part I only, dissenting:

The en banc majority reaches the conclusion that, while binding Supreme Court precedent interpreting the Fourth Amendment's proscription of unreasonable searches would clearly require the URSB to secure a warrant from a neutral judicial officer to conduct an inspection of the two apartment buildings in the absence of consent or exigent circumstances, the Fourth Amendment's proscription of unreasonable seizures, as illumined by the same and additional Supreme Court precedent, does not require the URSB to secure such a warrant before demolishing the same apartment buildings.  Unable to square this anomalous result with the language of the Fourth Amendment or Supreme Court jurisprudence, I dissent.

## I. FOURTH AMENDMENT

### A.  **Camara**, **Soldal**, and **Freeman**

The Freeman panel majority holding that the URSB violated the owners' Fourth Amendment rights correctly follows the Supreme Court's Fourth Amendment decisions in Soldal v. Cook County, Ill., 506 U.S. 56 (1992), and Camara v. Mun. Court of San Francisco, 387 U.S. 523 (1967).

In Frank v. Maryland, 359 U.S. 360 (1959) (5-4 decision), overruled by Camara, 387 U.S. at 523 (1967), the Court upheld, by a five-to-four vote, a state court conviction of a homeowner who

26

refused to permit a municipal health inspector to enter and inspect his premises without a search warrant. In his majority opinion, Justice Frankfurter suggested that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior, and that a warrant is not required for an administrative inspection because the "power [to inspect dwellings to maintain community health] would be greatly hobbled by the blanket requirement of the safeguards necessary for a search of evidence of criminal acts." Id. at 372.

In Camara, 387 U.S. at 534, the Court expressly overruled Frank v. Maryland, holding that under the Fourth Amendment a lessee of the ground floor of an apartment building had a constitutional right to insist that San Francisco Department of Public Health Housing Code inspectors obtain a judicial warrant to inspect his premises, and that he could not be constitutionally convicted for refusal to consent to the inspection. The Dallas URSB advances the same "public necessity" arguments in support of warrantless, non-exigent seizures and destruction of private property that the Court firmly rejected as insufficient to uphold San Francisco's warrantless, non-exigent housing code inspections in Camara. San Francisco argued that (i) the ordinances authorizing inspections are hedged with safeguards and the inspector's decision to enter must comply with the standard of reasonableness even if he may enter without a warrant, id. at 531; (ii) the warrant process could

27

not function effectively in this field, id. at 532; and (iii) the public interest demands warrantless administrative searches as the only effective means of enforcing minimum fire, housing, and sanitation standards, id. at 533. As Justice White, writing for the Camara majority, explained:

> In our opinion, these arguments unduly discount the purposes behind the warrant machinery contemplated by the Fourth Amendment. Under the present system, when the inspector demands entry, the occupant has no way of knowing whether enforcement of the municipal code involved requires inspection of his premises, no way of knowing the lawful limits of the inspector's power to search, and no way of knowing whether the inspector himself is acting under proper authorization. These are questions which may be reviewed by a neutral magistrate without any reassessment of the basic agency decision to canvass an area. . . . We simply cannot say that the protections provided by the warrant procedure are not needed in this context; broad statutory safeguards are no substitute for individualized review, particularly when those safeguards may only be invoked at the risk of a criminal penalty.

> . . . It has nowhere been urged that fire, health, and housing code inspection programs could not achieve their goals within the confines of a reasonable warrant requirement. Thus, we do not find the public need argument dispositive.

> In summary, we hold that administrative searches of the kind at issue here are significant intrusions upon

the interests protected by the Fourth Amendment, that such searches when authorized and conducted without a warrant procedure lack the traditional safeguards which the Fourth Amendment guarantees to the individual, and that the reasons put forth in Frank v. State of Maryland and in other cases for upholding these warrantless searches are insufficient to justify so substantial a weakening of the Fourth Amendment's protections.

Id. at 532-34.

Thus, Camara held that, in the absence of consent or an emergency situation, the Fourth Amendment requires that a warrant be issued by a judicial officer before a government entity may inspect private property to enforce minimum health and safety standards for the prevention of "fires and epidemics" or "unsightly conditions adversely affect[ing] the economic values of neighboring structures."  Id. at 534, 535, & 539-40.

In the second part of its opinion, the Court in Camara discussed the type of "probable cause" required for a warrant to enter and inspect private property.  The Court concluded that "'a health official need [not] show the same kind of proof to a magistrate as one must who would search for the fruits or instrumentalities of crime.'"  Id. at 538 (quoting Frank, 359 U.S. at 383) (Douglas, J., dissenting)).  Instead, the satisfaction of reasonable legislative or administrative standards for inspections may be used to show "probable cause," such as the passage of time, the nature of the buildings, the condition of the entire area, or

29

other factors not necessarily dependent upon specific knowledge of the condition of a particular dwelling.  See id.  "[R]easonableness is still the ultimate standard.  If a valid public interest justifies the intrusion contemplated, then there is probable cause to issue a suitably restricted warrant."  Id. at 539.[19]

In Soldal, 506 U.S. at 61, the Court held that the presence of deputy sheriffs for the purpose of forestalling the Soldal family's resistance while a trailer park operator seized and removed the family's house trailer from the park, without a warrant, eviction judgment, other judicial order, or exigent circumstances, clearly implicated the Soldals' Fourth Amendment rights.  In an unanimous opinion by Justice White, the Court rejected the Seventh Circuit's narrow reading of the Amendment, which the Circuit construed as safeguarding only privacy and liberty interests while leaving unprotected possessory interests when neither privacy nor liberty is at stake.  Id. at 62.  The Court held that "[t]he Amendment protects the people from unreasonable searches and seizures of 'their persons, houses, papers, and effects.'  This language surely cuts against the novel holding below, and our cases unmistakably hold that the Amendment protects property as well as privacy."  Id.

---

[19] In See v. City of Seattle, 387 U.S. 541 (1967), decided the same day as Camara, the Court held that the Fourth Amendment forbids warrantless inspections of commercial structures as well as private residences. "[T]he basic component of a reasonable search under the Fourth Amendment-that it not be enforced without a suitable warrant procedure–is applicable in this context, as in others, to business as well as to residential premises."  Id. at 546.

The Court pointed to its decisions explaining that a "seizure" of property occurs when "'there is some meaningful interference with an individual's possessory interests in that property,'" id. at 61 (quoting United States v. Jacobsen, 466 U.S. 109, 113 (1984)), and concluded: "We fail to see how being unceremoniously dispossessed of one's home in the manner alleged to have occurred here can be viewed as anything but a seizure invoking the protection of the Fourth Amendment." Id.

The Court in Soldal stopped short of deciding whether the seizure was a violation of the Fourth Amendment because the Seventh Circuit had failed to reach that issue due to its incorrect decision that there had been no "seizure." A careful reading of the Court's unanimous Soldal opinion, however, strongly suggests that a violation had occurred under Fourth Amendment law because (1) the dispossession of the Soldals of their trailer home was a "seizure" because it was a "meaningful interference" with their possessory interest, id. at 61, not an insignificant interference associated with a "garden-variety" landlord-tenant or commercial dispute, id. at 72; (2) the deputies were acting under color of state law in assisting in the seizure, id. at 60 n.6 & 71; (3) the officers were not acting pursuant to a warrant or other judicial order, id. at 58 and 71; (4) there was no probable cause to associate the seized property with criminal activity, id. at 68;

31

and (5) there was no emergency situation because the seizure could have "properly awaited the state court's judgment," id. at 71.

The Court noted that the Seventh Circuit had correctly acknowledged that, under the Supreme Court's precedents, the Fourth Amendment's protection applies in the civil as well as the criminal context. Id. at 67. But the Supreme Court concluded that the Circuit had erred when it seemingly construed the Amendment to protect only against seizures that are the outcome of a search. Id. at 68. "[O]ur cases are to the contrary and hold that seizures of property are subject to Fourth Amendment scrutiny even though no search within the meaning of the Amendment has taken place." Id. The Supreme Court explained that the Seventh Circuit's construction of the Fourth Amendment to protect only against seizures that are the outcome of a search is at odds with the Supreme Court's plain-view cases in which seizures of property are subject to Fourth Amendment scrutiny even though no search within the meaning of the Amendment has taken place. Id. at 68 (citing United States v. Jacobsen, 466 U.S. at 120-25; United States v. Place, 462 U.S. 696, 706-07 (1983); Cardwell v. Lewis, 417 U.S. 583, 588-89 (1974)). "For the plain-view cases clearly state that, notwithstanding the absence of any interference with privacy, seizures of effects that are not authorized by warrant are reasonable only because there is probable cause to associate the property with criminal activity." Id. at 69.

Significantly, the Court also made it clear that the Fourth Amendment protections are triggered when a government entity seizes a building to enforce compliance with housing regulations, stating:

> In our view, the reason why an officer might enter a house or effectuate a seizure is wholly irrelevant to the threshold question whether the Amendment applies. What matters is the intrusion on the people's security from governmental interference. Therefore, the right against unreasonable seizures would be no less transgressed if the seizure of the house was undertaken to collect evidence, verify compliance with a housing regulation, effect an eviction by the police, or on a whim, for no reason at all. As we have observed on more than one occasion, it would be "anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior."

Id. at 69 (quoting Camara, 387 U.S. at 530).[20]

Finally, the Court in Soldal characterized as "exaggerated" the fears of the Seventh Circuit and Cook County that applying the Fourth Amendment in this context will federalize areas of law traditionally the concern of the states, such as routine

---

[20] See also United States v. Jacobsen, 466 U.S. at 125 n.28 (relied on prominently in Soldal, in which the Court issued the following caveat: "Of course, where more substantial invasions [than taking a trace of powder for a chemical test] of constitutionally protected interests are involved, a warrantless search or seizure is unreasonable in the absence of exigent circumstances." (citing Steagald v. United States, 451 U.S. 204 (1981); Payton v. New York, 445 U.S. 573 (1980); Dunaway v. New York, 442 U.S. 200 (1979); United States v. Chadwick, 433 U.S. 1 (1977))).

33

repossessions, negligent actions of public employees that interfere with individuals' right to enjoy their homes, and the like. Id. at 71. The Court's opinion expressly or impliedly indicates several reasons for this conclusion: (1) activities by state actors such as repossessions or attachments that involve entry into the home, intrusion on individuals' privacy, or interference with their liberty, have long been recognized as implicating Fourth Amendment rights; (2) if the state action does not involve privacy or liberty interests,"'reasonableness is still the ultimate standard[. If a valid public interest justifies the intrusion contemplated, then there is probable cause to issue a suitably restricted search warrant.]'" Id. (quoting Camara, 387 U.S. at 539) (bracketed material added. See Camara, 387 U.S. at 539). Thus, generally speaking, a state officer will not violate the Fourth Amendment when his acts under color of law are (a) pursuant to a warrant or other judicial or court order, see id.; (b) in emergency situations, see Camara, 387 U.S. at 539; or (c) insignificant interferences associated with "garden variety" commercial or landlord-tenant disputes, Soldal, 506 U.S. at 72, rather than "some meaningful interference with an individual's possessory interests in . . . property." Id. at 61 (quoting Jacobsen, 466 U.S. at 113). For these reasons, it is evident that, if the Court in Soldal had been required to reach the issue, it would have concluded that the seizure in which the Soldals were "unceremoniously dispossessed" of

34

their trailer home, without a warrant, eviction judgment, or other judicial order, and in the absence of any emergency, was a violation of the Soldals' Fourth Amendment rights.[21]

Correspondingly, the Dallas URSB's seizure and destruction of the private property owners' edifices were "meaningful interferences" with their possessory interests in their buildings, not a "garden-variety" commercial or landlord-tenant controversy. On the contrary, it was a seizure and destruction of private property that was at least as invasive as the removal of a house trailer from a trailer park or the seizure of a building "undertaken to collect evidence, verify compliance with a housing regulation, effect an eviction by the police, or on a whim, for no reason at all." Soldal, 506 U.S. at 69. Consequently, the administrative seizures and demolitions by the URSB at issue in the present case were significant intrusions upon the interests of private property owners protected by the Fourth Amendment, and such seizures and demolitions by the URSB, a government entity acting under color of state law, not pursuant to a judicial warrant or court order, and not in an emergency situation, are clear

---

[21] On remand, in light of the Supreme Court's decision, the district court concluded that the defendants were not entitled to qualified immunity. "Because we determine that plaintiffs' allegations support an inference that the defendants were aware of circumstances making their actions unreasonable, and hence, illegal, we refuse to dismiss the action." Soldal v. County of Cook, No. 88C7654, 1993 WL 199050, *5 n.1 (N.D. Ill. June 10, 1993).

35

violations of the Fourth and Fourteenth Amendments.  See Camara, 387 U.S. at 534; Soldal, 506 U.S. at 66-67.

**B. This Court Is Bound By Camara and See, Not Frank v. Maryland**

A Federal Court of Appeals is bound by the decisions of the Supreme Court, even if the intermediate appellate judges think that a Supreme Court decision is unsound or in error.  See Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd., 460 U.S. 533, 535 (1983); Hutto v. Davis, 454 U.S. 370, 375 (1982); Jaffree v. Wallace, 705 F.2d 1526, 1532-33 (11th Cir. 1983)(citing and quoting Stell v. Savannah-Chatam County Bd. of Educ., 333 F.2d 55, 61 (5th Cir. 1964), overruled in part on other grounds by United States v. Jefferson County Bd. of Educ., 380 F.2d 385 (1967)); United States v. Twin City Power Co. of Georgia, 253 F.2d 197, 205 (5th Cir. 1958); Marcello v. Ahrens, 212 F.2d 830, 839 (5th Cir. 1954), aff'd, 349 U.S. 302 (1955).  Accordingly, this court must follow Camara and See, which held that, because of the Fourth Amendment, administrative entry or invasion of private residential or commercial property, without consent or an emergency situation, may only be compelled within the framework of a suitable judicial warrant procedure.

Nevertheless, the majority concludes that the district court and the panel Fourth Amendment majority were wrong in holding that the URSB violated the building owners' Fourth Amendment rights by seizing and destroying their private property without consent or a

36

warrant and in the absence of exigent circumstances. This conclusion is based on a common theme, (i) that the Fourth Amendment does not require a judicial warrant procedure to protect individuals from meaningful interferences with their possessory interests in private property by governmental entities; (ii) instead, the Amendment only protects such individuals by the deterrent effects of reparations under § 1983 if it is determined ex post facto that private property was seized or destroyed "unreasonably" according to a standard of reasonableness or a balancing of private and public interests. In effect, the majority seems to think that the warrant requirements of Camara and See have been overruled and Frank v. Maryland's warrantless standard of reasonableness has been resurrected in their place.

Similarly, the majority's reasoning erroneously suggests that Justice White's references in part III of Soldal to Camara and New Jersey v. T.L.O., 469 U.S. 325 (1985), somehow signal approval of warrantless seizures of private property, without consent or exigent circumstances, by officers acting under color of law, so long as the officers comply with a standard of reasonableness reflecting a careful balancing of public and private interests. The passage containing those references, part of Justice White's explanation that Soldal's interpretation of the Fourth Amendment involves little or no risk of federalizing state law, states:

> More significantly, "reasonableness is still the ultimate
> standard" under the Fourth Amendment, Camara, supra, 387

37

U.S., at 539, 87 S.Ct., at 1736, which means that numerous seizures of this type will survive constitutional scrutiny. As is true in other circumstances, the reasonableness determination will reflect a "careful balancing of governmental and private interests." T.L.O., supra, 469 U.S., at 341, 105 S.Ct., at 742. Assuming, for example, that the officers were acting pursuant to a court order, as in Specht v. Jensen, 832 F.2d 1516 (CA10 1987), or Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), and as often would be the case, a showing of unreasonableness on these facts would be a laborious task indeed. Cf. Simms v. Slacum, 3 Cranch 300, 301, 2 L.Ed. 446 (1806). Hence, while there is no guarantee against the filing of frivolous suits, had the ejection in this case properly awaited the state court's judgment it is quite unlikely that the federal court would have been bothered with a § 1983 action alleging a Fourth Amendment violation.

Soldal, 506 U.S. at 71.

A careful reading of the complete passages from which Justice White quoted in the forgoing paragraph shows that he, as the author of Camara, T.L.O., and Soldal, did not in any of those passages suggest dispensing with the warrant procedure. To the contrary, he consistently repeated the idea he expressed for the Court in Camara, "that a health official need not show the same kind of proof to a magistrate to obtain a warrant as one must who would search for the fruits or instrumentalities of crime." Camara, 387 U.S. at 538. Later in Camara, in the passage partially quoted in Soldal, Justice White stated: "The warrant procedure is designed to

guarantee that a decision to search private property is justified by a reasonable governmental interest. But reasonableness is still the ultimate standard. If a valid public interest justifies the intrusion contemplated, then there is probable cause to issue a suitably restricted search warrant." Id. at 539. The same day in See, he expressed these ideas in a different way:

> The agency's particular demand for access will of course be measured, in terms of probable cause to issue a warrant, against a flexible standard of reasonableness that takes into account the public need for effective enforcement of the particular regulation involved. But the decision to enter and inspect will not be the product of the unreviewed discretion of the enforcement officer in the field.

See, 387 U.S. at 545 (footnote omitted). His full sentence describing the flexible probable cause concept in T.L.O., reads: "Where a careful balancing of governmental and private interests suggests that the public interest is best served by a Fourth Amendment standard of reasonableness that stops short of probable cause, we have not hesitated to adopt such a standard." T.L.O., 469 U.S. at 341.

Justice White also wrote for the Supreme Court in Marshall v. Barlow's, Inc., 436 U.S. 307, 325 (1978), which held that, under the warrant clause of the Fourth Amendment, the Occupational Safety and Health Act (OSHA) is unconstitutional to the extent that it would permit inspections of private businesses by OSHA inspectors

39

without a warrant or its equivalent.  He began by reaffirming that "[t]he Warrant Clause of the Fourth Amendment protects commercial buildings as well as private homes", id. at 311, and that, accordingly, "warrantless searches are generally unreasonable, and that this rule applies to commercial premises as well as homes." Id. at 312.  Justice White then discussed Camara and See, and then concluded "that unless some recognized exception to the warrant requirement applies, See v. City of Seattle would require a warrant to conduct the inspection sought in this case."  Id. at 313. Because of the absence of a recognized exception to the warrant requirement – such as pervasively regulated businesses in which entrepreneurs voluntarily choose to subject themselves to the full arsenal of governmental regulation thereby precluding a reasonable expectation of privacy (which is clearly the exception and not the rule) – without a warrant a government inspector "stands in no better position than a member of the public."  Id. at 313-15.

Most important, in Marshall, Justice White expressly rejected the Secretary of Labor's argument that "the enforcement scheme of the Act requires warrantless searches, and that the restrictions on search discretion contained in the Act and in its regulations already protect as much privacy as a warrant would."  Id. at 315. These are precisely the arguments advanced by the City of Dallas and accepted by the majority in this case.  In fact, as the following passage aptly demonstrates, these arguments take out of

40

context <u>Soldal</u>'s quotation from <u>Camara</u> ("reasonableness is still the ultimate standard") and attribute to it a meaning explicitly rejected by Justice White:

> The Secretary thereby asserts the actual reasonableness of OSHA searches, whatever the general rule against warrantless searches might be. Because "reasonableness is still the ultimate standard," <u>Camara v. Municipal Court</u>, 387 U.S., at 539, 87 S.Ct., at 1736, the Secretary suggests that the Court decide whether a warrant is needed by arriving at a sensible balance between the administrative necessities of OSHA inspections and the incremental protection of privacy of business owners a warrant would afford. He suggests that only a decision exempting OSHA inspections from the warrant clause would give "full recognition to the competing public and private interests here at stake." <u>Ibid</u>.
>
> . . . .
>
> We are unconvinced, however, that requiring warrants to inspect will impose serious burdens on the inspection system or the courts, will prevent inspections necessary to enforce the statute, or will make them less effective.
> . . .

<u>Id.</u> at 315-16.

Moreover, Justice White makes crystal clear that "reasonableness" afforded by the statutory scheme may substitute for probable cause to issue the warrant, but it may not substitute for the warrant itself:

> Whether the Secretary proceeds to secure a warrant or other process, with or without prior notice, his

41

entitlement to inspect will not depend on his demonstrating probable cause to believe that conditions in violation of OSHA exist on the premises. Probable cause in the criminal law sense is not required. For purposes of an administrative search such as this, probable cause justifying the issuance of a warrant may be based not only on specific evidence of an existing violation but also on a showing that "reasonable legislative or administrative standards for conducting an . . . inspection are satisfied with respect to a particular [establishment]." Camara v. Municipal Court, 387 U.S., at 538, 87 S.Ct., at 1736. . . . We doubt that the consumption of enforcement energies in the obtaining of such warrants will exceed manageable proportions.

Id. at 320-21 (footnote omitted)(bracketed text in original).

Finally, Justice White rejected the notion "that the incremental protections afforded the employer's privacy by a warrant are so marginal that they fail to justify the administrative burdens that may be entailed." Id. at 322.

The authority to make warrantless searches devolves almost unbridled discretion upon executive and administrative officers, particularly those in the field, as to when to search and whom to search. A warrant, by contrast, would provide assurances from a neutral officer that the inspection is reasonable under the Constitution, is authorized by statute, and is pursuant to an administrative plan containing specific neutral criteria.

Id. at 323(footnote omitted).

Against this background, it is clear that Justice White in the Soldal paragraph quoting parts of the Camara and T.L.O. passages

42

did not impliedly or silently overrule the principal holding of Camara that significant administrative intrusions require a warrant procedure, in the absence of consent or an emergency.[22] Read within the context of the passages from Camara, See, Marshall, and T.L.O., describing the flexible standard of reasonableness, it is clear that in that Soldal paragraph Justice White merely expressed the opinion that it will be difficult to show a Fourth Amendment violation when an officer seizes property pursuant to a court order, if the order was measured and issued according to a reasonable standard based on a careful balancing of public and private interests.  This meaning is borne out by the citation in the Soldal paragraph calling upon the reader to reference Simms v. Slacum, 3 Cranch 300, 301, 7 U.S. 300, 306-07 (1806), in which Chief Justice Marshall stated:

> The judgments of a court of competent jurisdiction, although obtained by fraud, have never been considered as absolutely void; and, therefore, all acts performed under

---

[22]  In summary, we hold that administrative searches of the kind at issue here are significant intrusions upon the interests protected by the Fourth Amendment, that such searches when authorized and conducted without a warrant procedure lack the traditional safeguards which the Fourth Amendment guarantees to the individual, and that the reasons put forth in Frank v. Maryland and in other cases for upholding these warrantless searches are insufficient to justify so substantial a weakening of the Fourth Amendment protections.

Camara, 387 U.S. at 534.

43

them are valid so far as respects third persons. A sheriff who levies an execution under a judgment fraudulently obtained, is not a trespasser, nor can the person who purchases at a sale under such an execution, be compelled to relinquish the property he has purchased.

7 U.S. at 306-07.

In short, <u>Camara</u>, <u>See</u>, <u>Marshall</u>, <u>T.L.O.</u>, and <u>Soldal</u> all indicate that under certain circumstances a flexible standard of reasonableness can substitute for the kind of probable cause that must be shown by law enforcement officers to obtain a warrant to search for criminal evidence; they do not support the notion that reasonableness can substitute for the judicial warrant that is required before an administrative search or seizure of private property without consent or an emergency situation.

This court cannot legitimately overrule or disregard <u>Camara</u> and <u>See</u>, which require a warrant before a municipality can effect a search or seizure of private residential or commercial property without consent or emergency circumstances under health, safety, and building regulations, even if a flexible probable cause or reasonableness standard has been met.

The language upon which the majority relies in arguing that <u>Camara</u> and <u>See</u> are inapplicable is taken out of context from the "special, beyond normal, law enforcement needs" cases that are inapposite here. The cases the majority cites--<u>Vernonia Sch. Dist.</u>

44

v. Acton (suspicionless random drug testing of high school athletes in a particular exigent factual situation); Griffin v. Wisconsin (reasonable grounds search without a warrant of probationer within legal custody under state law pursuant to a state regulation authorizing such warrantless searches); New Jersey v. T.L.O. (search of student's purse on suspicion of violation of school rule against smoking)--are those in which the Court has "permitted exceptions when 'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'" Vernonia Sch. Dist. v. Acton, 515 U.S. 646, 653 (1995) (citing Griffin v. Wisconsin, 483 U.S. 868, 873 (1987)).

The Court in those cases clearly limited the "special needs" exception to the warrant requirement to special situations in criminal law enforcement: "A State's operation of a probation system, like its operation of a school, government office or prison, or its supervision of a regulated industry, likewise presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable cause requirements." Griffin, 483 U.S. at 873-74; see also Chandler v. Miller, 520 U.S. 305 (1997) (Georgia's requirement that candidates for state office pass drug test did not fit within closely guarded special needs category of constitutionally permissible suspicionless searches ); United Teachers of New Orleans v. Orleans Parish Sch. Bd., 142 F.3d 853 (5th Cir. 1998) (school board's rules

violated Fourth Amendment inasmuch as no special needs exception to requirement of individualized suspicion of wrongdoing applied).

The present case is not a criminal law enforcement case, much less a "special needs, beyond the normal need for law enforcement" case, and it is certainly not a case in which the warrant requirement is impracticable. The majority's rejection of the warrant requirement in this case makes it difficult to say that it exists at all in the Fifth Circuit, except for few persons whose criminal convictions are reversed because the violation of their Fourth Amendment rights was so flagrant as to amount to harmful, reversible error.

## C. This Circuit and Others

In concluding that the URSB violated the owners' Fourth Amendment rights, the Freeman panel Fourth Amendment majority decision followed the controlling precedent of this Circuit, and this decision does not conflict with what is the controlling precedents of other circuits.

In United States v. Paige, 136 F.3d 1012, 1021 (5th Cir. 1998), this court recognized that "[t]he Supreme Court recently made clear that the protection afforded by the Fourth Amendment extends to an individual's possessory interests in property, even if his expectation of privacy in that property has been completely extinguished." (citing Soldal, 506 U.S. at 62-63). This court in Paige also observed that "[g]enerally, 'seizures conducted outside

46

the judicial process, without prior approval by a judge or magistrate, are per se unreasonable under the Fourth Amendment–subject only to a few specifically established and well delineated exceptions.'" Id. at 1022 (quoting Minnesota v. Dickerson, 508 U.S. 366, 372 (1993)). The Freeman Fourth Amendment majority applied Paige's teachings from the Supreme Court cases of United States v. Jacobsen, 466 U.S. 109, and United States v. Place, 462 U.S. 696, to conclude that the URSB seizures do not fall within an exception to the warrant requirement fashioned in those cases because the seizures were not lawful and temporary in their inception, the seizures did not have a de minimis impact on the owners' property interests, and it could not be said that the safeguards of a warrant would have only minimally advanced Fourth Amendment interests. Freeman v. City of Dallas, 186 F.3d 601, 606 (5th Cir. 1999).

The Freeman Fourth Amendment majority is not inconsistent with the other Circuits' leading cases although it is at odds with an Eighth Circuit case. In Flatford v. City of Monroe, 17 F.3d 162, 170 (6th Cir. 1994), the Sixth Circuit held that under the Fourth Amendment the plaintiffs "were entitled to pre-eviction judicial oversight in the absence of emergency circumstances." That court also found that the eviction had been predicated upon exigent circumstances. Id. at 170-71. In Hroch v. City of Omaha, 4 F.3d 693, 697 (8th Cir. 1993), the Eighth Circuit held that the

47

defendants' actions in implementing the City's condemnation order did not constitute an unreasonable seizure in violation of Hroch's Fourth Amendment rights. The Hroch court pointed out that a state court had denied an injunction so that there was judicial oversight of the condemnation process which provided "a constitutionally adequate substitute for a warrant." Id. at 696-97 (citing and quoting Donovan v. Dewey, 452 U.S. 594, 603 (1981)). In Conner v. City of Santa Ana, 897 F.2d 1487, 1492 (9th Cir. 1990), the Ninth Circuit held that a search and seizure of the Conners' property to abate a known nuisance without any judicial authorization was impermissible under the Fourth Amendment. Although Conner was decided before Soldal, it is consistent with that decision because it relied on Camara, and Soldal did not change Camara; rather, Soldal only reaffirmed what had been established before, that the Fourth Amendment protects property as well as privacy and may protect property interests even when neither privacy nor liberty is at stake. Soldal, 506 U.S. at 62-71. In Samuels v. Meriwether, 94 F.3d 1163, 1167-68 (8th Cir. 1996), however, the Eight Circuit misread Soldal as overruling Camara sub silentio and replacing the warrant process required by Camara with a reasonableness balancing test. Soldal does not express or imply such an intention, however, and it is absurd to attribute to Justice White, the author of both opinions, an intention to overrule Camara without saying so,

48

particularly since he cites and quotes <u>Camara</u> prominently with approval in <u>Soldal</u>.

All of these circuit decisions, except <u>Samuels v. Meriwether</u>, are consistent with a correct reading of <u>Camara</u>, <u>See</u>, and <u>Soldal</u> which plainly indicate that, in the context of administrative searches and seizures, compliance with reasonable legislative and administrative standards may serve as probable cause for a warrant, but not as a substitute for the warrant procedure itself; <u>see</u> <u>Camara</u>, 387 U.S. at 538, 545-46; <u>Soldal</u>, 506 U.S. at 71; although nothing forecloses prompt inspections, even without a warrant, that the law has traditionally upheld in emergency situations. <u>See</u> <u>Camara</u>, 387 U.S. at 539.

### D. Other Arguments

A number of rationales are advanced by the majority that have a false appearance of genuineness, but are really only variations on their main theme of contention:

(1) That only self-imposed reasonableness is required of a governmental entity in seizing and razing buildings for urban renewal, and the municipal procedures followed by the URSB assured sufficient reasonableness in this case. This argument is premised upon two faulty propositions: (i) that Fourteenth Amendment due process of law and Fourth Amendment reasonableness analyses are fungible; and (ii) that <u>Soldal</u> sub silentio overruled <u>Camara</u> and its warrant requirement for administrative searches and seizures,

49

thereby resurrecting <u>Frank v. Maryland</u> and its warrantless reasonableness standard. With respect to (i), in <u>Soldal</u>, the Supreme Court expressly rejected that proposition, stating that "[c]ertain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands. Where such multiple violations are alleged . . . we examine each constitutional provision in turn." 506 U.S. at 70; <u>see</u> <u>also</u> <u>United States v. James Daniel Good Real Prop.</u>, 510 U.S. 43, 49-50 (1993) (in considering claims that the same government conduct violated both the Fourth Amendment protections against unreasonable seizure and the Fifth Amendment protections of due process of law, the Court stated that it has repeatedly rejected the view that the applicability of one constitutional amendment preempts the guarantees of another). <u>Flatford</u>, 17 F.3d at 170-71, does not support the argument either, because it, in effect, merely concludes that both the Fourth Amendment and Due Process standards are relaxed where the conduct complained of is justified by exigent circumstances. With respect to (ii), as demonstrated earlier, <u>Soldal</u>, a unanimous opinion by Justice White, building on and citing with approval his own opinion for the court in <u>Camara</u>, cannot reasonably be read to implicitly or silently overrule <u>Camara</u>'s core holding that, in the absence of consent or exigent circumstances, administrative searches or seizures of private

50

houses or buildings without a judicial warrant violate the Fourth Amendment, and that Frank v. Maryland is expressly overruled.

(2) That the URSB is the functional equivalent of a neutral and detached judicial officer. The fallacy of this contention is self-evident. The URSB is an agency of the City of Dallas charged with the remediation – including the demolition--of structures deemed by it to constitute urban nuisances. The URSB's job is to eliminate unsightly conditions adversely affecting the economic value of neighboring property and the City's tax base. The URSB cannot possibly serve effectively in this executive capacity and act as a neutral and detached magistrate to safeguard the rights of the owners whose buildings it determines should be razed. "When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent." Camara, 387 U.S. at 529 (citing and quoting Johnson v. United States, 333 U.S. 10, 14 (1948)). This principle applies with equal force to the seizure and destruction of real property by government enforcement agencies such as the URSB, because the decision to seize and destroy private property under these circumstances, like the decision to enter and inspect, "[can]not be the product of unreviewed discretion of the enforcement officer in the field." Id. at 545. Rather, the "warrant machinery contemplated by the Fourth Amendment" so prominently emphasized by Justice White is necessarily administered

51

by a "neutral magistrate."  See Camara, 387 U.S. at 532; Marshall, 436 U.S. at 323.

(3) That the warrant process would overburden the URSB.  This argument was rejected firmly by the Supreme Court in Camara, see 387 U.S. at 532, and again in Marshall, 436 U.S. at 321.  Moreover, the step of securing a warrant issued by a neutral and detached judicial officer is not difficult or time consuming.  The property owner benefits greatly from the safeguarding of his protected interests that can only be provided by a neutral judicial officer's pre-execution approval of the seizure and demolition.  In the present case, as is typical, almost a year passed between the notices of noncompliance and the ultimate demolition orders.  Had the URSB at the appropriate time during this lengthy period properly obtained a warrant for the seizure and demolition of the owners' buildings, it is almost certain that the federal court would not have been bothered with this § 1983 action alleging a Fourth Amendment violation.

(4) That Texas currently has no procedural mechanism for judicial oversight of public nuisance abatement.  However, it appears that such oversight is provided for by Texas legislated law.  See Tex. Gov't. Code Ann. §§ 24.08 (district court may hear and determine any cause cognizable by courts of law or equity), and 24.011 (district court judge may grant all writs necessary to enforce the court's jurisdiction).  Moreover, judicial oversight of

52

public nuisance abatement in the context of this case is required by Texas jurisprudence. See City of Houston v. Lurie, 224 S.W.2d 871, 874 (Tex. 1949) ("It has been repeatedly held that the question whether property is a public nuisance and may be condemned as such is a justiciable question to be determined by a court."); Hart v. City of Dallas, 565 S.W.2d 373, 379 (Tex.Civ.App.-Tyler 1978, no writ) (whether the URSB or the city council made the determination that the house was a hazard to the health, safety, and welfare of the citizens, "the City would have been without authority to demolish the house in the absence of a judicial determination that the house was a nuisance in fact."). Moreover, even if the Texas courts lacked express statutory or jurisprudential authority to issue warrants for the search or seizure of property, undoubtedly they are endowed with such authority by the Fourth Amendment, the State Constitution, and their inherent judicial powers.

## II.  DUE PROCESS

The plaintiffs cross-appealed the district court's ruling against their Fifth Amendment claim. I dissent from the en banc majority's decision, affirming summary judgment in favor of the City of Dallas on the due process claim for the same reasons that I dissented from the panel's decision. See Freeman, 186 F.3d at 612-14 (Dennis, dissenting).

53

A governmental seizure of a person's property implicates two explicit textual sources of constitutional protection, the Fourth and Fifth Amendments. <u>James Daniel Good Real Prop.</u>, 510 U.S. at 49-50; <u>Soldal v. Cook County</u>, 506 U.S. at 61, 70-71. Although the decision in <u>James Daniel Good Real Property</u> was based upon the procedural protections of the Fifth Amendment's Due Process Clause, the similarly worded procedural protections of the Fourteenth Amendment's Due Process Clause apply with equal force to states and municipalities.[23]

---

[23]The Supreme Court has held that the Fourteenth Amendment's Due Process Clause "legitimately operates to extend to the citizens and residents of the States the same protection against arbitrary state legislation, affecting life, liberty and property, as is offered by the Fifth Amendment against similar legislation by Congress." <u>Hibben v. Smith</u>, 191 U.S. 310, 325 (1903). Of the guarantees of the Fifth Amendment, only the grand jury clause has been held not to be applicable to the states. 2 Ronald D. Rotunda & John E. Nowak, <u>Treatise on Constitutional Law</u> § 14.2, at 347-48 (2d ed. 1992) (citing <u>Hurtado v. California</u>, 110 U.S. 516 (1884)). The Fifth Amendment prohibitions of compulsory self-incrimination and double jeopardy were made applicable to the states in <u>Malloy v. Hogan</u>, 378 U.S. 1 (1964), and <u>Benton v. Maryland</u>, 395 U.S. 784 (1969), respectively. In addition, although the Fifth Amendment's just compensation provision has not "technically" been incorporated against the states, "the Court has held that the fourteenth amendment due process guarantee provides the same safeguard against a state's taking of property without just compensation." 2 Rotunda & Nowak, <u>supra</u>, § 14.2, at 350 (citing <u>Chicago B. & Q. R. Co. v. Chicago</u>, 166 U.S. 226 (1897)). <u>See also</u> <u>Hurtado v. California</u>, 110 U.S. 516, 541 (1884) (Harlan, J., dissenting) ("[T]he 5th [amendment] provided that 'no person shall be deprived of life, liberty or property, without due process of law.' This language is similar to that of the clause of the 14th amendment now under examination. That similarity was not accidental, but evinces a purpose to impose upon the States the same restrictions, in respect of proceedings involving life, liberty and property, which had been imposed upon the General Government.").

The City does not, and could not, dispute that the seizure and destruction of the plaintiffs' real property deprived them of property interests protected by the Fifth and Fourteenth Amendments' Due Process Clauses. The City argues, however, that a hearing before a panel of the City's own Urban Rehabilitation Standards Board afforded the plaintiffs all the process they were due before their property was seized and destroyed. I believe that in the absence of an extraordinary situation, which did not exist in the present case, the Due Process Clauses require that, before a person is deprived of his real property by the government, he must be given notice and an opportunity for a meaningful hearing before a neutral magistrate, and that there must be a judicial determination that the seizure is justified.

Where the government seizes property not to preserve evidence of criminal wrongdoing but to assert ownership and control over the property, its action must also comply with the procedural protections of the Due Process Clauses of the Fifth and Fourteenth Amendments. James Daniel Good Real Prop., 510 U.S. at 50. The Supreme Court's precedents establish the general rule that Due Process requires that, absent an extraordinary situation, a party cannot invoke the power of the state to seize a person's property without a prior judicial determination that the seizure is justified. United States v. $8,850, 461 U.S. 555, 562 n.12 (1983) (citing Boddie v. Connecticut, 401 U.S. 371, 378-379 (1971)); see

55

also <u>North Georgia Finishing, Inc. v. Di-Chem, Inc.</u>, 419 U.S. 601 (1975); <u>Fuentes v. Shevin</u>, 407 U.S. 67 (1972); <u>Sniadach v. Family Finance Corp.</u>, 395 U.S. 337 (1974); <u>Mitchell v. W.T. Grant Co.</u>, 416 U.S. 600 (1974). Due Process also requires that individuals must receive notice and an opportunity to be heard before the government deprives them of property. <u>James Daniel Good Real Prop.</u>, 510 U.S. at 48 (citing <u>$8,850</u>, 461 U.S. at 562 n. 12; <u>Fuentes</u>, 407 U.S. at 82; <u>Sniadach</u>, 395 U.S. at 342 (Harlan, J., concurring); <u>Mullane v. Cent. Hanover Bank & Trust Co.</u>, 339 U.S. 306, 313 (1950)).

In <u>James Daniel Good Real Property</u>, the Supreme Court held that, in the absence of exigent circumstances, the Due Process Clause requires the government to afford notice and a meaningful opportunity to be heard in an adversary hearing, to ensure the requisite neutrality that must inform governmental decisionmaking, before seizing real property subject to civil forfeiture. 510 U.S. at 48, 53-56. The protection of an adversary hearing before a neutral magistrate is of particular importance where the government has a direct pecuniary interest in the outcome of the proceeding. <u>Id.</u> at 55-56. In <u>James Daniel Good Real Property</u>, the Supreme Court emphasized that "[t]he constitutional limitations we enforce in this case apply to real property in general, not simply to residences." <u>Id.</u> at 61.

Accordingly, the Due Process requirements of notice, a meaningful adversary hearing before a neutral magistrate, and a

56

judicial determination of justification must be afforded to a person before his real property is seized and destroyed in order to abate or rehabilitate an "urban nuisance." In a case such as the present one, there is need for equally rigorous adherence to the principles of Due Process as in civil forfeitures of real property. The City of Dallas has pecuniary interests in the outcome of such proceedings, e.g., justification for federal and state urban renewal grants; enhancement of the municipal tax base by promoting the replacement of old buildings with new ones. The need for safeguards against arbitrary, capricious, or unreasonable seizures based on subjective standards may be even greater in "urban nuisance" or "urban rehabilitation" cases. Moreover, a post-seizure hearing cannot provide any remedy in such cases because the destroyed property cannot be restored and the best evidence of whether the seizure was justified will have been demolished also. It is not necessary to accomplish the City's legitimate goals of urban rehabilitation that an owner whose real property the City proposes to destroy be deprived of an opportunity for a meaningful pre-seizure adversary hearing before a neutral and impartial judge or magistrate. Requiring the City to postpone seizure and destruction until after such a hearing and judicial determination that the seizure is justified creates no significant administrative burden. And any harm that results from delay is minimal in

comparison to the injury occasioned by the erroneous seizure and destruction of real property.  <u>Id.</u> at 59.

## III. CONCLUSION

In summary, <u>Camara</u> and <u>See</u> require a judicial warrant procedure for the administrative search or seizure of private property, except in consensual or emergency situations.  <u>Soldal</u> does not overrule or modify <u>Camara</u> or <u>See</u>; it simply makes clear that the Fourth Amendment protects property as well as privacy and liberty.  The <u>Freeman</u> Fourth Amendment majority correctly applied <u>Camara</u>, <u>See</u>, and <u>Soldal</u>, and the other circuits' decisions, except for one, are not in conflict with that interpretation. Thus, I would affirm the judgment against the City of Dallas.

Because the process used by the City of Dallas failed to meet the requirements of due process as dictated by the Fifth Amendment, I would also reverse the judgment for the City of Dallas and would grant summary judgment in favor of the plaintiffs on this claim.