# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CA-01190-COA

**LINDA LEE**                                                                          **APPELLANT**

**v.**

**THE CITY OF PASCAGOULA, MISSISSIPPI**                                **APPELLEE**

DATE OF JUDGMENT:                    11/18/2022
TRIAL JUDGE:                                 HON. KATHY KING JACKSON
COURT FROM WHICH APPEALED:   JACKSON COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:          WILLIAM HARVEY BARTON
ATTORNEY FOR APPELLEE:            MICHAEL RILEY MOORE
NATURE OF THE CASE:                  CIVIL - STATE BOARDS AND AGENCIES
DISPOSITION:                               AFFIRMED IN PART; REVERSED AND
                                                   REMANDED IN PART - 04/09/2024
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., GREENLEE AND McCARTY, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1.     Linda Lee owned the Crown Inn in Pascagoula, which over the decades had declined until it became a magnet for crime. The City Council sought to have the structure declared a public menace and informed Lee it sought to have the property "cleaned." Yet at the City Council meeting, the entire hotel was ordered to be demolished. Lee appealed to the circuit court, which affirmed the City's decision.

¶2.     She now argues that the City's decision to declare the property a menace was not supported by substantial evidence and that she was not given proper due process given the scope of action sought by the City. As to the first point, we find the record contains ample proof the Crown Inn was a public menace. However, upon review, we find Lee was not

given proper notice of the scope of action sought by the City. Therefore, we affirm in part and reverse in part, and we remand in part.

## BACKGROUND

¶3. Linda Lee was the owner of the Crown Inn Motel in Pascagoula. The 30,738 square-foot motel was built in 1970 and sat on 4 acres. The land's value was $69,520, and the total appraised value for the property was $632,785.

¶4. At some point the Crown Inn fell into disrepair. Crime plagued the motel. Notably, between 2017 and 2021 the Pascagoula Police Department received over 1,000 calls for service at the property. The calls ranged from nuisance to felony. Among the calls to police were those reporting death, domestic disturbance, burglary, theft, attempted suicide, drugs, public drunk, simple assault, "animal warden needed," fighting, "man with a gun," sexual assault, firearm discharge, and child molestation.

¶5. And the calls for service were not to the generic address of the hotel. They were 911 calls about the various guests in specific units. For instance, the call for service for an attempted suicide was for room 118. Some of the same rooms had more than one call for service, like how several rooms called 911 regarding a domestic disturbance as well as theft.

¶6. On September 16, 2021, the South Mississippi Enforcement Team sent Lee a letter demanding that she abate the nuisance on her property, citing Mississippi Code Annotated section 41-29-309 (Rev. 2023). The letter stated the reasons for the nuisance were "numerous narcotics arrests, . . . [and] numerous complaints over many years." This included

2

the 1,000-plus calls for service or complaints since 2017.

¶7.   On October 26, 2021, the city's building official provided notice to the property owner that the property would be condemned effective November 1, 2021.  The next day, the City of Pascagoula set a hearing to determine whether the property constituted a menace under Mississippi Code Annotated section 21-19-11 (Rev. 2015).  Lee was sent notice pursuant to State law.  A portion of the notice read:

> You are hereby notified that the City Council of the City of Pascagoula, Mississippi, has alleged that the above listed property, which is located within the City of Pascagoula, Mississippi, is in such a state of uncleanliness as to be a menace to the public health, safety, and welfare of the community.
>
> A hearing on the issues regarding the condition of this property has been ordered by the City Council **for 6:00 p.m. on Tuesday, the 7th day of December, 2021.** The hearing will be conducted in the Council Chambers of City Hall at 603 Watts Avenue, Pascagoula, MS 39567. At this hearing you and/or anyone with concerns regarding this property will be given an opportunity to be publicly heard, if so desired.
>
> An adjudication that this parcel of land is in need of cleaning will authorize the City of Pascagoula, or its designee, to reenter the property to maintain cleanliness for a period of one (2) years without any further hearing. Notice of intent to reenter will be displayed, seven (7) days in advance, at the parcel of land and at City Hall. No other notice of re-entry is required or will be given.
>
> A copy of this notice is being placarded on the property, mailed to the physical address, mailed to the address where ad valorem tax notice is sent, and to any lien holders.

¶8.   The City mailed the notice "to the address where ad valorem tax notice is sent" and posted the notice both at the Crown Inn and City Hall.  However, there were multiple irregularities within the notice—despite the language on the document, it was not sent to the

3

street address of the motel.  Further, the notice did not mention that pursuant to State law the notice was required to be posted at City Hall.

¶9.     On December 7, 2021, the Pascagoula City Council conducted the hearing to determine the status of the property.[1]  In a subsequent order, the Jackson County Circuit Court summarized the proceedings, recounting how Building Official Josh Church presented pictures showing "exposed insulation, presence of mold, faulty and exposed wiring, and structural deficiencies."  The circuit court also noted Church "stated that the property improperly transitioned from a motel into apartments and that there was a heavy presence of vagrants."

¶10.    Lee's son James was present at the hearing and informed the Council of his intention to "purchase the property and clean it up and convert it to workforce lodging."  In part, he argued that the Crown Inn was more of an asset to the City than a liability—pointing out that just a year before, the property paid $100,000 for property taxes and utilities. When asked by a council member if he would also provide security for the property, James responded that he would.

¶11.    Accompanying James was his general contractor who had visited the property and reviewed the alleged code deficiencies.  He described to the Council what actions needed to

---

[1] While made a part of the record below and included as an exhibit, the footage of the Council meeting was not originally sent to this Court for review; when ultimately received, full playback failed.  Diligent work by both the Clerk of Appellate Courts and our Information Technology Department ensured we could review the provided footage.

be done to "bring the buildings up to code." He even suggested to the city council to give James "6 months to do it, if he doesn't do it then tear it down."

¶12. Nonetheless, one of the City Council members was heard comparing the Crown Inn to another dilapidated property and then saying, "[A]nd the best thing that happed to [that property] was we tore it down, I think the same thing needs to happen to this property." A vote was quickly held, and a resolution was immediately adopted.

¶13. The City adopted a resolution declaring the property "a menace to public health, safety and welfare[.]" Even though Lee had only been put on notice that the City sought the "cleaning" of her property, the resolution declared, "[T]he City Council of Pascagoula hereby directs the Building Official **to have any dilapidated structures removed** and the site cleaned . . . and to present to the City Council the actual cost or cleaning the subject property for adjudication so that said cost may become an assessment against the property." (Emphasis added). Despite the urging of the contractor at the hearing, the Crown Inn was ordered to be immediately demolished.

¶14. Lee appealed the City Council's decision to the Jackson County Circuit Court pursuant to State law. She argued the City failed to provide due process by not complying with the statutory notice requirements, the City's decision was not supported by substantial evidence, and she was never given the opportunity to cure or repair the code violations prior to the City taking action.

¶15. The trial court found that the City "complied with the notice requirements" of State

law. The court further found the "the property was vacant, notice was mailed almost one month prior to the hearing date to Linda Lee's address where her *ad valorem* taxes are sent[, and] . . . the notice was posted on the front door of the Crown Inn and at City Hall."

¶16.    In making this determination, the trial court considered the knowledge of one the councilmen, who expressed the property's reputation for being a "crack house" and "prostitute hangout." The court also "considered photos and statements by the [building official] regarding the dilapidated conditions of the property and the inherent dangers of those conditions."   Accordingly, the trial court also found substantial evidence that the property constituted a menace under State law.[2]

¶17.    Lee appealed, and the case was assigned to us for review.

## STANDARD OF REVIEW

¶18.    "The decision of an administrative agency is not to be disturbed unless the agency order was unsupported by substantial evidence; was arbitrary or capricious; was beyond the agency's scope or powers; or violated the constitutional or statutory rights of the aggrieved party." *Vazzana v. City of Greenville*, 116 So. 3d 1103, 1105 (¶9) (Miss. Ct. App. 2013).

---

[2] During this process, Lee filed a civil suit for the deprivation of her federal rights to due process, which the City removed to federal court.  It was dismissed at the end of 2023 after the district court concluded Lee had "abandoned her equal protection and takings claims" and that summary judgment was proper on her claims for deprivation of procedural and substantive due process under the federal constitution.  *Lee v. City of Pascagoula*, No. 1:23CV63-LG-RPM, 2023 WL 8654932, at *7 (S.D. Miss. Dec. 14, 2023).  The district court recognized the pendency of Lee's appeal before this Court and did not exercise supplemental jurisdiction over her state-law claims "[t]o avoid interference with the state court action or potential contradictory decisions regarding the same issues[.]" *Id.*

"Substantial evidence has been defined as 'such relevant evidence as reasonable minds might accept as adequate to support a conclusion' or to put it simply, more than a 'mere scintilla' of evidence." *Id*.

¶19. "However, for questions of law, the standard of review is de novo." *Webb v. Town Creek Master Water Mgmt. Dist.*, 903 So. 2d 701, 705 (¶13) (Miss. 2005).

## ANALYSIS

### I. There was substantial evidence the Crown Inn was a public menace.

¶20. Lee argues that Pascagoula's decision to declare the Crown Inn a menace to public health, safety, and welfare was arbitrary and capricious. Specifically, she argues it was not supported by substantial evidence. After review, we find the record amply supports the City's finding that the property was a public menace.

¶21. It is well established that "[r]egulation of nuisance properties is at the heart of the municipal police power." *Freeman v. City of Dallas*, 242 F.3d 642, 652-53 (5th Cir. 2001). "It is eminently reasonable for a city to prescribe minimum property maintenance standards to protect the public and to maintain adjacent land values." *Id.* "Nevertheless, a city may not arbitrarily enter abatement orders or declare the existence of nuisances with no underlying standards." *Id.*

¶22. Ten years ago, in *Vazzana*, we addressed a similar situation with dilapidated property. In that case, the city clerk issued notice informing him his four "properties were believed to be in a state of uncleanliness to such an extent that they constituted a menace to the public

7

health." *Vazzana*, 116 So. 3d at 1104 (¶2). "The notice advised Vazzana that a hearing would be held . . . to determine whether the properties should be cleaned or demolished." *Id.* Vazzana was present at the hearing, and "he acknowledged that he had been personally served with the notice of the hearing." *Id.* at (¶3).

¶23. Vazzana's properties were "a mess." *Id.* at 1106 (¶15). According to the record, there were "piles of wood stacked high in the yard, vines growing all over structures, and a huge tree lying in the yard." *Id.* There were also several broken windows and broken window panes in the yard. *Id.* Vazzana also had "several old cars and a bread truck parked in the yard[.]" *Id.* Additionally, "there were several tires and other pieces of equipment . . . scattered throughout the yard." *Id.* Consequently, the City determined that the properties were a menace; some properties were ordered to be cleaned and others were ordered to be demolished. *Id.* at 1104-05 (¶¶4-7).

¶24. Vazzana then appealed to the circuit court. *Id.* at 1105 (¶8). The circuit court affirmed the city council's decision, finding that the property owner "had proper notice and . . . noted Vazzana's appearance and participation at the hearing." *Id.* "The circuit court further found that city council's decision concerning the four properties was supported by substantial evidence." *Id.*

¶25. On appeal, Vazzana claimed that he received insufficient notice of the hearing and the city council's actions were arbitrary and capricious. *Id.* at 1104 (¶1). We rejected his argument, finding that Vazzana was "present at the hearing [and] acknowledged that he had

8

been personally served with the notice of hearing" on the first issue. *Id.* at (¶3). Further, a video was admitted "clearly show[ing] Vazzana's properties were a mess." *Id.* at 1106 (¶15). And he had "failed to present any evidence to show that his properties were not a menace," therefore, the city council's actions were not arbitrary or capricious. *Id.* at (¶14).

¶26. Like in *Vazzana*, and for lack of a better term, the record supports the Council's finding the Crown Inn was "a mess." *Id.* at (¶15). In the words of the City building official, the 1970s-era structure was plagued with "exposed insulation, presence of mold, faulty and exposed wiring, and structural deficiencies." This alone could constitute proof the Crown Inn violated the City's health and safety standards for an occupied building.

¶27. But that was not the only proof before the City Council. Critically, a spreadsheet showed over 1,000 calls to law enforcement reporting dozens of different crimes at the motel. On appeal, Lee attempts to minimize some of the impact of this evidence, but she cannot dispute many of the calls that are made to specific rooms at the motel. Given the evidence provided, it was neither arbitrary nor capricious for the City Council to declare the motel a menace to the public health, safety, and welfare of the community.

¶28. We find there was substantial evidence to support the declaration of a public nuisance and therefore finding the Crown Inn to be a public menace.

## II.    Lee did not receive proper notice.

¶29. Lee alleges that the City of Pascagoula did not provide her proper notice of the scope of the remedy it sought, namely the demolition of the Crown Inn, and likewise did not give

9

her sufficient notice of the hearing where it adjudicated the property a menace.

¶30.    It is without doubt that our municipalities have the right to clean properties or remove structures when due process has been provided to the landowner. When first scrutinizing this particular issue over fifty years ago, our Supreme Court reasoned that "[i]t is a sensible and reasonable rule that where the property owner, after reasonable notice provided for in an ordinance, fails and refuses to either repair or remove an unsafe and unfit building that constitutes a public nuisance, that the municipality can remove it at the owner's expense." *Bond v. City of Moss Point*, 240 So. 2d 270, 273 (Miss. 1970).  "Otherwise the property owner could enjoy the profits from his building during its useful life and then neglect or abandon it in its old age and demand that the municipality, at the expense of all taxpayers, compensate him for it or remove it and clear his property so that he could show his land to its best advantage." *Id*.

¶31.    Before such a remedy may be exercised under the menace statute, the municipality must follow a very strict series of rules to afford due process.  Our Constitution of 1890 guarantees, "No person shall be deprived of life, liberty, or property except by due process of law."  Miss. Const. art. 3, § 14.  "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Miss. Bd. of Veterinary Med. v. Geotes*, 770 So. 2d 940, 943 (¶13) (Miss. 2000) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Carl Ronnie Daricek Living Tr. v. Hancock Cnty. ex rel.*

10

*Bd. of Sup'rs*, 34 So. 3d 587, 595 (¶16) (Miss. 2010) (examining the due process required when temporarily seizing properties to repair a seawall). "Due process therefore requires that a defendant be given adequate notice." *Id*.

### A.  The Requirements of Notice Under the Menace Statute

¶32.  To serve those general concepts of fairness, the Legislature has specifically articulated the method of when and how a property owner is warned their property is at risk of government action under the menace statute.  "To determine whether property or parcel of land located within a municipality is in such a state of uncleanliness as to be a menace to the public health, safety and welfare of the community," there are four key requirements of notice.  Miss. Code Ann. § 21-19-11(1) (Rev. 2015).

> Notice shall be provided to the property owner by:
>
> (a) United States mail two (2) weeks before the date of the hearing mailed [1] to the address of the subject property, except where the land or structure(s) is apparently vacant, and [2] to the address where the ad valorem tax notice for such property is sent by the office charged with collecting ad valorem tax; and
>
> (b) Posting notice for at least two (2) weeks before the date of a hearing [3] on the property or parcel of land alleged to be in need of cleaning and [4] at city hall or another place in the municipality where such notices are posted.

Miss. Code Ann. § 21-19-11(1)(a)-(b) (numbers added for clarity).  The notice must also contain a warning "that an adjudication at the hearing that the property or parcel of land is in need of cleaning will authorize the municipality to reenter the property or parcel of land for a period of two (2) years after final adjudication without any further hearing[.]" *Id.*

¶33.  The Legislature clearly constructed this system of four overlapping warnings so a

11

landowner, absent or present, is provided ample notice of the proceedings, minimizing the possibility of a due process violation. We have ruled these specific requirements must be met to afford the landowner actual notice of the proceedings. *See Scarborough v. City of Petal*, 60 So. 3d 193, 198 (¶18) (Miss. Ct. App. 2010) (rejecting a "constructive notice" argument by the municipality when a co-owner was not served with actual notice of the proceedings).

¶34.    The statute also contains a key provision that the landowner has the opportunity to cure the defect before the municipality takes over. The governing authority is only authorized to act "*if* the owner does not do so himself[.]" Miss. Code Ann. § 21-19-11(1) (emphasis added).

¶35.    Actions that can be taken to abate a public menace include "cutting grass and weeds; filling cisterns; removing rubbish, abandoned or dilapidated fences, outside toilets, abandoned or dilapidated buildings, slabs, personal property . . . and other debris; and draining cesspools and standing water therefrom." *Id.*

¶36.    Removal of property or demolition of structures is not the only risk faced by a person who has their property declared a menace. If the governing authority prevails on having the property declared a menace and getting approval to clean or demolish it, "the governing authority may by resolution adjudicate the actual cost of cleaning the property and may also impose a penalty not to exceed One Thousand Five Hundred Dollars ($1,500.00) or fifty percent (50%) of the actual cost, whichever is more." *Id.* § 21-19-11(1). The costs include whether the city does the work itself or contracts it out and can also include "administrative

12

costs and legal costs of the municipality." *Id.*

¶37.    The statute builds in a series of precise notice requirements because the risk to a landowner is high, and the requirements of our Constitution are no less exacting. Ample notice must be provided before the government seizes the private property of a landowner, or removes or destroys it, and then makes the property owner pay for these corrective actions.

¶38.    So the essential ingredients of the notice that must be provided to a landowner before a municipality takes action is multifaceted. First, the governing authority must strictly comply with the Legislature's requirement of providing notice in four ways to the landowner: mailing it to the address of the property (unless it "is apparently vacant"), mailing it to the address where the ad valorem tax notice is sent, posting it on the property, and posting it "at city hall or another place in the municipality where such notices are posted." *Id.* § 21-19-11(1)(a)-(b).

¶39.    These notices must be provided to the landowner at least 14 days before a scheduled hearing.[3] *Id.* The hearing itself is fundamental: it is a public forum where the landowner

---

[3] In *Daricek Living Trust*, the Supreme Court strongly implied that if a total seizure of property was at stake via eminent domain, a minimal time period of 30 days was required. 34 So. 3d at 595 (¶17) (holding that "[t]hirty-days' notice is constitutionally sufficient" and relying on *Branaman v. Long Beach Water Mgmt. Dist.*, 730 So. 2d 1146, 1151 (¶13) (Miss. 1999) (holding that in cases of eminent domain for purposes of drainage two days' notice was insufficient and that "the Mississippi Rules of Civil Procedure will control the amount of notice that a landowner should be given after a complaint is filed" until the Legislature amended the statute to provide more notice)). Lee has not argued that the 14 days she was provided under the statute was insufficient to prepare for the hearing before the City Council.

13

may be heard before any threatened action is taken. *See Miss. State Bd. of Contractors v. Hobbs Constr. LLC*, 291 So. 3d 762, 770 (¶18) (Miss. 2020) ("The right to an opportunity to be heard includes a reasonable opportunity to know the claims of the opposing party and to meet them").

¶40. Yet multiple instances of notice and an opportunity to be heard have little meaning if the landowner does not understand the scope of the action the municipality seeks to take. Therefore, the landowner must be provided specific notice of what is at stake in the proceeding. In *Hobbs*, the Mississippi Supreme Court explained what due process requires: "Notice must be reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id*. So "[t]he notice must be of such nature as reasonably to convey the required information," thereby "actually informing the absentee" of what they face in the proceedings. *Id*. (cleaned up).

¶41. Therefore, an opportunity to be heard only has meaning when the landowner has advance notice of the stakes at the hearing. In *Hobbs*, our Supreme Court explained why this advance notice is critical. Relying on United States Supreme Court precedent, the Court held, "'The right to an opportunity to be heard includes 'a reasonable opportunity *to know the claims of the opposing party* and to meet them.'" *Hobbs*, 291 So. 3d at 770 (¶18) (emphasis added) (quoting *Morgan v. United States*, 304 U.S.1, 18 (1938)). "'Those who are brought into contest with the Government in a quasijudicial proceeding aimed at the

14

control of their activities are entitled to be *fairly advised of what the Government proposes* and to be heard upon its proposals before it issues its final command.'" *Id*.[4] (emphasis added).

¶42.    Because there are a wide range of remedies that may be taken by the municipality pursuant to the statute, it is incumbent to specifically explain what action is sought.  For on one end, the action threatened may be minimal and pose little risk or cost to the landowner, like the removal of an outside toilet.  On the other hand, the action may be the maximum that can be taken, like demolishing a house or business at the potential cost of hundreds of thousands of dollars.  The landowner must also be informed that the municipality may assess it the costs of cleaning or demolition if the property is determined to be a menace.

¶43.    The owner must also be given the opportunity to cure the menace before action is taken.  The statute expressly states that this opportunity must be given *after* the hearing adjudicating the property as a menace.  *See* Miss. Code Ann. § 21-19-11 ("If, at such hearing, the governing authority shall adjudicate the property or parcel of land in its then condition

_____

[4] The separate opinion argues that Lee was somehow put on notice of the particular risks of the City's action, as she was charged with understanding the entire range of action embodied in the statute.  It is true that we generally impute knowledge of a statute to a citizen.  But due process requires something different than a general approach.  As this precedent from our Supreme Court makes clear, Lee was "entitled to be fairly advised of what the Government proposes" after declaring her property to be a menace.

Accordingly, a finding that Lee is "presumed to know the law" would defeat the very purpose of due process, and contravene almost a century of precedent. It would also hollow out the guarantee in our Constitution of 1890 that "[n]o person shall be deprived of . . . property except by due process of law."

15

to be a menace to the public health, safety and welfare of the community, the governing authority, *if the owner does not do so himself*, shall proceed to clean the land, by the use of municipal employees or by contract").

¶44.   Indeed, the opportunity to cure an alleged noncompliance before seizure was core to the Supreme Court's initial approval of the power of a municipality to declare property a public menace.  As the Court itself phrased the question before it in 1970, "whether a municipality is authorized to raze and remove an unsafe and unfit building at the expense of the property owner *when he has failed and refused* to either repair his building or remove it and clear his land."  *Bond*, 240 So. 2d at 272.

### B.    The Requirements of Due Process Applied to the Facts of this Case

¶45.   Applying the express statutory language of the menace statute and our precedent to the case at hand, we see outright deficiencies and repeated irregularities in the notice provided to the landowner.[5]  In her brief, Lee protests that "[n]o where [sic] does the Notice alert the property owners that the property may be condemned and destroyed."  Instead, she argues it is a generic document that "is unconstitutionally vague and deficient on its face." After review, we agree.

¶46.   As set out above, proper notice requires the landowner be alerted to the risks of being declared a public menace (whether removal of personal property or destruction of structures),

---

[5] A full copy of the notice is attached to this opinion as Appendix 1.

16

the possibility of being assessed costs for this action, and the opportunity to cure the menace before the government takes action. The notice contains none of these vital ingredients. Instead, Lee was provided only the most basic information that her property required "cleaning" pursuant to the menace statute.

¶47. Yet at the hearing before the City Council, after Lee's son and a contractor suggested remedies to bring the Crown Inn up to standard, one of the council members suddenly suggested the demolition of the entire 30,738 square-foot property. The rest agreed, and this remedy was adopted as a resolution. The resolution also directed the City Building Official to calculate "the actual cost of cleaning the subject property for adjudication so that said cost may become an assessment against the property." The resolution did not give Lee any time to cure the menace before the City took action, even after the contractor who spoke on her behalf asked for six months to remedy the problem, and her son agreed he could retain private security.

¶48. The notice failed to meaningfully convey to the property owner what the City alleged to be a public menace, how this could be cured, and the actual remedy the City sought. The notice only alleged the Crown Inn was "in such a state of uncleanliness as to be a menace," without specifying what the "uncleanliness" was. The notice did not inform Lee that the City was actually seeking to have the Crown Inn demolished; instead, the notice only alleged she was at risk of "[a]n adjudication that this parcel is in need of cleaning[.]" She was not informed the scope of "cleaning" was not to remove weeds or abandoned tires, but actually

17

the structures that had stood on the property since 1970—which the City's record showed constituted 30,738 square feet with an appraised value of $632,785. The risk to Lee was not losing a run-down old wooden shed in the backyard but forfeiting a large hotel property on multiple acres.

¶49.    This is the most extreme remedy under the menace statute—the demolition of a large structure plus assessment of costs. Just as Lee was not warned the removal of the Crown Inn was at stake, the notice also failed to warn her that the City might assess those costs against her and require them to be paid. She was also not given any opportunity to abate the menace before the highest sanction available under statute was levied.

¶50.    We see then that there are at least three critical failures of due process: the landowner was not given notice of the scope of actions the City sought; she was not informed beforehand that the cost of the structure's demolition would be assessed against her; and she was not given an opportunity to cure the menace before such actions were taken. This was a violation of her right to due process as established by the statute itself.[6]

---

[6] Lee also takes to task whether she was even properly served notice of the proceedings pursuant to statute. The notice itself contains irregularities. It states "A copy of this notice is being placarded on the property, mailed to the physical address, mailed to the address where ad valorem tax notice is sent, and to any lien holders." But State law also requires the notice to be posted at city hall, which the notice did not address. And both sides agree the notice was not mailed to the physical address of the Crown Inn, with the City arguing it did not have to as the statute relieves such when the address is "apparently vacant"—even though this extra statutory notice only costs a single stamp and an envelope. Because the notice failed in three core ways to alert Lee to the risks of noncompliance, we do not address these irregularities.

¶51.    In cases where we have upheld the removal or demolition of structures on private property, municipalities have provided much more robust notice of the risks and costs faced by property owners, including an opportunity to cure before facing seizure, demolition, and a cost assessment.

¶52.    For instance, in *Vazzana*, we pointed out how he was specifically told the risks of failure to bring his properties up to code, as the "notice advised [him] that a hearing would be held . . . to determine whether the properties were a menace to the community, and if so, whether the properties should be cleaned or demolished." *Vazzana*, 116 So. 3d at 1104 (¶2). The notice provided to the landowner in that case specifically informed him that the city would make a "recommendation" to the council "as to whether or not proceed to have the structure demolished and lot cut, cleaned and sprayed of all trash and debris at your cost, if you do not elect to do it yourself."[7]    As required by the menace statute, Vazzana was told about the risks of what he faced, his responsibility to shoulder the costs of compliance, and his opportunity to cure. *Id.*

¶53.    Although we reversed in *Scarborough* because of the lack of actual notice provided to a co-owner of the property, the record also reveals similar compliance with the menace statute.  60 So. 3d 193 at 194 (¶3).  The landowner was sent a letter "that the building . . . presented a public health and safety hazard to the community, and it should be removed" and

_____

[7] This notice, contained in the record from that appeal, is attached as Appendix 2. We take judicial notice of our own docket and the appellate court files. *Badger v. State*, 290 So. 3d 377, 381 (¶14) (Miss. Ct. App. 2020).

19

"had thirty days from receipt of the letter to remove the violation." *Id.* In all caps, the landowner was told "DILAPIDATED BUILDING PRESENTS A SAFETY HAZARD AND SHOULD BE REMOVED OR BROUGHT UP TO CODE."[8] "Your cooperation in removing the violation will be appreciated," the letter read, before providing the 30 days' opportunity to cure. Last, the landowner was informed that "[s]hould you elect not to remove the violation," and the city forced to act, "[t]he cost would be assessed back to you." Just as in *Vazzana*, and as required by State law, the landowner was told the risks of what was at stake, given an opportunity to cure, and warned of a cost assessment if the menace continued.

¶54. And in another case where a city had "condemned the remains of a brick structure," with eleven specific violations pointed out by the building inspector, the landowner was given ample opportunity to cure before the municipality took action. *Bray v. City of Meridian*, 723 So. 2d 1200, 1201 (¶2) (Miss. Ct. App. 1998). The notice allowed an opportunity "to show cause why the specified repairs and/or demolition should not be completed." *Id.* at (¶3). After this specific notice, they were first "directed to repair the structural defects to meet the minimum standards of housing or demolish the structure" themselves, or face the repercussions of the city handling the cost and work. *Id.* at (¶4). Nonetheless, "[t]he Brays did not repair or demolish the structure by the deadline set in the order." *Id.* at (¶5). We ultimately affirmed, finding "[t]he record is replete with the City's repeated attempts to get Bray either to repair or demolish the dilapidated structure." *Id.* at

---

[8] Attached as Appendix 3.

1204 (¶29).

¶55. The notice provided to Lee fell short of the statutory requirements of the menace statute and that provided to other landowners in similarly situated cases. Because the City failed to provide her with the notice required by the menace statute, we reverse in part and remand in part to the circuit court for further proceedings with this opinion to determine the proper remedy, if any. *See Scarborough*, 60 So. 3d at 198 (¶¶18-19) (determining co-owner of property was not given notice of proceedings and holding "we reverse the circuit court's judgment granting summary judgment in favor of the City and remand this case to the circuit court for further proceedings consistent with this opinion"); *Leavitt v. Carter*, 178 So. 3d 334, 343 (¶30) (Miss. Ct. App. 2012) (reasoning "if there was a statutory due process violation . . . the appropriate remedy would be to remand to the circuit court for further factual determinations").

¶56. Because this issue is not developed in this record, and was not heard by the circuit court, the parties may choose to present proof as to Lee's course of conduct after the notice and resolution by the City Council, whether any actions taken by Lee or others afterward were voluntary or involuntary, and any other facts or law that are relevant.

### III. This appeal is not moot.

¶57. The City argues this appeal is moot, offering that after the City Council took action, Lee transferred the Crown Inn to her son, who then demolished it.

¶58. But the factual basis of this argument is not contained in the record. Instead, the City

21

relies on a series of documents that are outside the record that it merely filed on the appellate docket. This is not allowed by our Rules of Appellate Procedure or our precedent.

¶59. "This Court will not consider matters that do not appear in the record, and it must confine its review to what appears in the record." *Jones v. Jones*, 307 So. 3d 1229, 1231 (¶7) (Miss. Ct. App. 2020). "Attaching documents to briefs or including them in record excerpts does not make them a part of the certified record as required by Mississippi Rule of Appellate Procedure 10, and so they will not be considered." *Id.*; *see* MRAP 10(e) (detailing the method for correction or modification of the record).

¶60. So when a party "improperly attache[s] documents to [its] brief that are not part of the trial record," we have held "[t]hese documents are also outside of our review." *Webster v. State*, 152 So. 3d 1200, 1202 n.2 (Miss. Ct. App. 2014); *Lang v. Pub. Emps.' Ret. Sys. of Miss.*, 284 So. 3d 814, 817 n.2 (Miss. Ct. App. 2019) (granting a "motion to strike portions of [a] brief that discuss documents not considered by PERS or the circuit court" because "[t]hese documents do not appear in the record on appeal in the present case, and the record is clear that PERS and the circuit court did not consider these documents below").

¶61. Accordingly, we do not consider this argument.

**CONCLUSION**

¶62. We find the decision by the City Council to declare the Crown Inn a public menace was supported by substantial evidence and affirm the judgment in part. However, because the notice provided to Lee did not inform her of the scope of action sought by the City, she

faced a cost assessment if the motel was declared a public menace and removed, and she was not given an opportunity to cure the deficiencies, she was not afforded due process. Accordingly, we reverse the judgment in part and remand to the Circuit Court for a determination of what remedy should be afforded, if any.

¶63.    **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**BARNES, C.J., GREENLEE, WESTBROOKS, McDONALD AND EMFINGER, JJ., CONCUR.  SMITH, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.  CARLTON, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY WILSON, P.J., AND SMITH, J.  LAWRENCE, J., NOT PARTICIPATING.**

**CARLTON, P.J., CONCURRING IN PART AND DISSENTING IN PART:**

¶64.    I concur with the majority's determination that the City Council's decision to declare the Crown Inn a public menace was supported by substantial evidence.  I dissent, however, with respect to the majority's determination that "Lee was not given proper notice of the scope of action sought by the City."  Maj. Op. ¶2.  The majority finds that there were three "failures of due process" in this case because (1) the notice provided Lee of the menace hearing did not give her "notice of the scope of actions the City sought;" (2) the notice did not inform Lee "beforehand [that] the cost of the structure's demolition would be assessed against her;" and (3) Lee "was not given any opportunity to abate the menace before" the highest sanction available under statute was levied.  Maj. Op. ¶50.  I disagree with the majority's assessment and do not find that there was a "failure[] of due process" in this case. Lee was provided with proper notice of the menace hearing in accordance with Mississippi

23

Code Annotated section 21-19-11 (Supp. 2021). Therefore, I dissent on this issue.

¶65. The notice provided to Lee clearly informed her that the menace hearing could result in an "adjudication" requiring the "cleaning" of the property. In particular, the notice provided that it related to the City's allegation that the property "is in such a state of uncleanliness as to be a menace to the public health, safety, and welfare of the community," and that the people at the hearing would address "the issues regarding the condition of this property." The notice further advised Lee that the City Council may make "[a]n adjudication that this parcel of land is in need of cleaning" and that the "City of Pascagoula, or its designee," may "reenter the property to maintain cleanliness."

¶66. The majority asserts that the notice is defective because it did not set forth the precise "scope of action" the City might take or specifically state that costs of cleanup would be assessed against the landowner. But a plain reading of section 21-19-11 shows that there is no requirement that such specificities must be delineated in the notice. Rather, these issues are addressed in the statute itself. Lee is "presumed to know the law." *Whitaker v. T & M Foods Ltd.*, 7 So. 3d 893, 899 (¶17) (Miss. 2009); *City of Ellisville v. Smith*, 221 Miss. 234, 239, 72 So. 2d 451, 453 (1954). Also relevant is that on October 26, 2021, before the menace-hearing notice was sent, Lee had already received a condemnation notice concerning the buildings on the property. The condemnation notice specifically listed *"[d]ilapidated structure"* and "multiple building code violations" as reasons for the buildings' condemnation. (Emphasis added).

24

¶67. Thus, through the notice, Lee was informed that the hearing would address whether her property needed "cleaning," and through the condemnation notice, Lee was informed that the buildings on the property were considered "dilapidated structure[s]." Section 21-19-11 describes what "clean[ing] the land" entails—and this description specifically includes *"removing . . . abandoned or dilapidated buildings*." Miss. Code Ann. § 21-19-11(1) (emphasis added).

¶68. Section 21-19-11 also plainly explains that "[t]he cost [of cleanup] and any penalty may become a civil debt against the property owner, and/or, at the option of the governing authority, an assessment against the property." *Id.*

¶69. The statute does not require the notice of the section 21-19-11 menace hearing to explicitly describe the remedy sought or state the landowner will be assessed with cleanup costs. Indeed, Lee also had notice that the "dilapidated structure[s]" on the property were at issue. The remedy available to the City under these circumstances is clearly contained in the statute. Accordingly, I do not agree that the notice was insufficient because it did not set forth these details.

¶70. Regarding the majority's third concern (an opportunity for the landowner to conduct cleanup herself), section 21-19-11 provides that notice of the hearing must take place at least two weeks before the hearing date. Miss. Code Ann. § 21-19-11(1)(a)-(b). The notice in this

25

case was furnished nearly a month before the December 7, 2021 hearing.[9]  Also, as noted,

Lee had already received a condemnation notice on October 26, 2021.

¶71.    Section 21-19-11 further sets forth information that must be contained in a notice of

a menace hearing, as follows:

> Any notice required by this section shall include language that informs the property owner that an adjudication at the hearing that the property . . . is in need of cleaning will authorize the municipality to reenter the property . . . for a period of two (2) years after final adjudication without any further hearing *if notice is posted on the property or parcel of land and at city hall or another place in the municipality where such notices are generally posted at least seven (7) days before the property or parcel of land is reentered for cleaning.*

Miss. Code Ann. § 21-19-11(1) (emphasis added).

¶72.    In accordance with these requirements, the notice provided to Lee tracks nearly

verbatim the statutory language, as follows:

> An adjudication that this parcel of land is in need of cleaning will authorize the City of Pascagoula, or its designee, to reenter the property to maintain cleanliness for a period of one [(sic)] (2) years without any further hearing.

---

[9] I acknowledge that there were some irregularities in the notice provided in this case, such as the failure to mention posting of the notice at City Hall, and that the notice was not mailed to the physical address of the Crown Inn, which was apparently vacant, according to the City.  *See* Miss. Code Ann. § 21-19-11(1)(a)-(b); Maj. Op. n.6.  However, Linda Lee and her son James Lee received notice of the hearing, notice was posted at the Crown Inn and City Hall, and notice was mailed "to the address where ad valorem tax notice is sent." *See* Miss. Code Ann. § 21-19-11(1)(a)-(b).  James attended the hearing, accompanied by his general contractor, and both participated in the hearing.  Under these circumstances, I do not find that the irregularities that happened here are fatal.  *See Vazzana v. City of Greenville*, 116 So. 3d 1103, 1106 (¶11) (Miss. Ct. App. 2013) (rejecting property owner's inadequate-notice argument where the owner "was present at the hearing, . . . he acknowledged that he had been personally served with the notice of the hearing[,] . . . [and,] [i]n fact, [the property owner] actively participated in the hearing").

*Notice of intent to reenter will be displayed, seven (7) days in advance, at the parcel of land and at City Hall.* No other notice of re-entry is required or will be given.

(Emphasis added).

¶73. Regarding a landowner's ability to initiate a cleanup herself, section 21-19-11 provides: "If, at [the menace] hearing, the governing authority shall adjudicate the property . . . in its then condition to be a menace to the public health, safety[,] and welfare of the community, the governing authority, *if the owner does not do so himself*, shall proceed to clean the land . . . ." Miss. Code Ann. § 21-19-11(1) (emphasis added).

¶74. Read as a whole, section 21-19-11 alerts the notice recipient that following the posted notice of a menace adjudication, an owner may initiate cleanup of the property herself within seven days of that posting. If the owner has not done so within seven days, the governing authority may enter the property and "shall proceed to clean the land." *Id.* The notice provided to Lee contained the requisite seven-day notice language. Through the notice, read in combination with the statute, Lee was plainly informed of her right to initiate a post-adjudication cleanup of the property.[10]

¶75. In sum, as Lee is "presumed to know the law," she must likewise "abide the consequences of [her] . . . actions." *Whitaker*, 7 So. 3d at 899 (¶17). Lee was provided a notice of condemnation and proper advance notice of the menace hearing, alerting her that

---

[10] As the majority points out, "Lee's course of conduct after the notice and resolution by the City Council" was "not developed in this record," Maj. Op. ¶56, and, thus, we do not know what occurred after that point.

27

the hearing would involve an adjudication that could require a cleanup of her property. She likewise was provided notice of the post-adjudication seven-day window within which she was entitled to initiate the cleanup herself. Section 21-19-11, itself, clearly sets forth what cleanup can be ordered (including "removing . . . abandoned or dilapidated buildings"), how costs (and penalties) may be assessed, and the landowner's right to perform a cleanup—information that Lee was free to ascertain upon receiving proper statutory notice furnished in accordance with section 21-19-11. For all these reasons, I dissent with respect to the majority's insufficient-notice determination.

**WILSON, P.J., AND SMITH, J., JOIN THIS OPINION.**

## NOTICE

DATE:    November 5, 2021

TO:    Linda Lee
Crown Inn
1600 Indian Point Pkwy.
Gautier, MS 39553

FROM:    City of Pascagoula Building Department
Attn: Adam Burks
4015 14th Street
Pascagoula, MS 39567

PROPERTY ADDRESS: **3500 14th St.**

PARCEL IDENTIFICATION NUMBER:    **41703207.000**

DEED OR PLAT BOOK AND PAGE REFERENCE:    **Book 1672, Page 580**

You are hereby notified that the City Council of the City of Pascagoula, Mississippi, has alleged that the above listed property, which is located within the City of Pascagoula, Mississippi, is in such a state of uncleanliness as to be a menace to the public health, safety, and welfare of the community.

A hearing on the issues regarding the condition of this property has been ordered by the City Council **for 6:00 p.m. on Tuesday, the 7th day of December, 2021**. The hearing will be conducted in the Council Chambers of City Hall at 603 Watts Avenue, Pascagoula, MS 39567. At this hearing you and/or anyone with concerns regarding this property will be given an opportunity to be publicly heard, if so desired.

An adjudication that this parcel of land is in need of cleaning will authorize the City of Pascagoula, or its designee, to reenter the property to maintain cleanliness for a period of one (2) years without any further hearing. Notice of intent to reenter will be displayed, seven (7) days in advance, at the parcel of land and at City Hall. No other notice of re-entry is required or will be given.

A copy of this notice is being placarded on the property, mailed to the physical address, mailed to the address where ad valorem tax notice is sent, and to any lien holders.

If you have [seal] se call the Building Department at (228) 938-6620.

Witness my signature and seal of office on this the 5th Day of November, 2021.

By: _Karen Kennedy_
Karen Kennedy, City Clerk

NOTICE

To:   Phillip Vazzana
242 ½ South Poplar Street
Greenville, Mississippi 38701

You are hereby notified that the Properties Committee of the City of Greenville, Mississippi has been advised and believes that a parcel owned by you and located at     **308 Central Street-East 47.8 of West 101.8 of South 93 of Lot 1, Block 12, Bachelor Bend Addition, Lot size 47.8 x 95, Parcel # 11674400000** is in such a state of dilapidation and uncleanness as to constitute a menace to the public health and safety of the community; said condition being caused by the following: **dilapidated structure and/or, overgrown grass, weeds, trash, debris, etc.**

You are further notified pursuant to Section 21-19-11, MCA, that on the **3rd day of March, 2010 at 4:00 p.m.** a hearing will be conducted in the City Council Chambers located at City Hall, 340 Main Street, Greenville, Mississippi to make a determination as to whether or not said property remains in such a state of dilapidation and uncleanness as to be a menace to the public health and safety of the community. A recommendation will also be made to the Greenville City Council as to whether or not to proceed to have the structure demolished and lot cut, cleaned and sprayed of all trash and debris at your cost, if you do not elect to do so yourself.

The recommendation of the Properties Committee will be heard at the very next regular _Greenville City Council meeting on March_ 16, 2010 at 4:00 p.m.

If desired, you may appear at the hearing to be conducted on   _March 3, 2010 at 4:00 p.m_   If you have any questions, you may contact D'Andre Williams, Housing Inspector at (662) 378-1093.

This, the _9th_ day of _February , 2010._

The Properties Committee of the City of Greenville

_Amelia D. Wicks_
Amelia D. Wicks
City Clerk

00073



GARDNER
ENGINEERING, P.A.
ENGINEERING - SURVEYING - TESTING    ECTION

*I hand delivered the original copy to Percy 1-18-06*

# ;ITY OF PETAL

POST OFFICE BOX 564
PETAL, MISSISSIPPI 39465
(601) 545-1776
FAX NO. (601) 545-6685

CARL SCOTT
MAYOR

DAVID CLAYTON
KAY FAIRLEY
JAMES MOORE
STEVE STRINGER
LIESA WEAVER
ALDERMEN

## G INSPECTION DEPARTMENT

January 17, 2006

JEAN ISHEE
CITY CLERK

THOMAS W. TYNER
CITY ATTORNEY

Indianola (662) 887-1862     Kosciusko (662) 290-0708

**ADDRESS:**   220 Arkwood Lane, Petal, MS  39465

**RE: DILAPIDATED BUILDING**

**PROPERTY LOCATED AT:**   415 W. Central Avenue, Petal, MS  39465

Community appearance is a vitally important aspect of civic pride, as is health and safety, which contributes to the preservation and enhancement of the environmental quality of our City, as well as stimulation of our economy.  Petal residents have expressed their desire, through the City Council, that the City assign a high priority to beautifying our community through vigorous code enforcement measures.  An inspection of your property has indicated that the following condition exists:

DILAPIDATED BUILDING    PRESENTS A SAFETY HAZARD AND SHOULD BE REMOVED OR BROUGHT UP TO CODE. IT IS IN SUCH A STATE OF DIS-REPAIR AS TO BE A MENANCE TO THE PUBLIC HEALTH AND SAFETY OF THE COMMUNITY.

We are respectfully requesting that the subject property be cleared of all violations described above.  We are interested in the health, safety and appearance of our neighborhoods.  Your cooperation in removing the violation will be appreciated.  You have ___30___ days     from receipt of this letter to remove the violation.  The Code Enforcement Officer will re-inspect at that time.  **IT IS YOUR RESPONSIBILITY TO CALL FOR AN INSPECTION UPON REMOVAL OF THE VIOLATIONS.**

Should you elect not to remove the violation, the City will exercise its rights under the "Cleaning of Private Property" section of the Mississippi Code 21-19-11.  The cost would be assessed back to you.

In the event you do not own the property in question, or if there are joint owners, please advise our office as soon as possible.

John Thomsen
John Thomsen
Code Enforcement Officer

046

EXHIBIT

G